Lisa Michelle LAMBERT

v.

Mrs. Charlotte BLACKWELL,
Supt., et al.

Civ. A. No. 96–6244.

United States District Court,
E.D. Pennsylvania.

April 28, 1997.

Schnader, Harrison, Segal & Lewis, and Christina Rainville, Peter S. Greenberg, Philadelphia, PA, for Lambert.

## MEMORANDUM

DALZELL, District Judge.

Lisa Lambert has petitioned this Court for a writ of habeas corpus, alleging, among other things, that she is actually innocent of the first degree murder for which she was convicted in July of 1992, and that she was the victim of wholesale prosecutorial misconduct in connection with the prosecution of her case. As a result of her being raped by a prison guard in the Pennsylvania Department of Corrections system,[1] Ms. Lambert has been in the custody of Charlotte Blackwell, the Superintendent of the Edna Mahan Corrections Facility for Women in New Jersey.

After reviewing Ms. Lambert's *pro se* petition for the writ, we concluded that the interests of justice required that we appoint counsel on her behalf. *See* 18 U.S.C. § 3006A(a)(2); *see also Reese v. Fulcomer*, 946 F.2d 247, 263–64 (3d Cir.1991), *cert. denied*, 503 U.S. 988, 112 S.Ct. 1679, 118 L.Ed.2d 396 (1992). On October 4, 1996, we appointed the firm of Schnader, Harrison, Segal & Lewis, and Christina Rainville, Esq. of that firm, to represent Ms. Lambert on a *pro bono* basis. We gave counsel three months in which to prepare an amended petition, which they filed on January 3, 1997. In the amended petition, Ms. Lambert also names the District Attorney of Lancaster County and the Attorney General of the Commonwealth of Pennsylvania as additional respondents.

After affording both sides discovery,[2] we commenced a hearing on the petition on March 31, 1997. After twelve days of testimony, as a result of a breathtaking act of conscience by Hazel Show, mother of victim Laurie Show, we on April 16, 1997 with re-

---

1. It is undisputed that a jury convicted the guard of this sexual assault in the Cambridge Springs, Pennsylvania, State Correctional Institution.

2. *See, e.g.,* Order of January 16, 1997, entered pursuant to Rule 6 of the Rules Governing Section 2254 Cases.

spondents' consent released Lisa Lambert to the custody of her lawyers, Ms. Rainville and Peter S. Greenberg, Esq.[3] After fourteen days of testimony covering 3,225 pages of transcript, we have now concluded that Ms. Lambert has presented an extraordinary— indeed, it appears, unprecedented—case. We therefore hold that the writ should issue, that Lisa Lambert should be immediately released, and that she should not be retried. This Memorandum will constitute our findings of fact and conclusions of law in support of this disposition.

*Background*

Lisa Lambert was, on July 20, 1992, convicted of the first degree murder of Laurie Show, a sixteen-year-old high school student who lived in East Lampeter Township, in Lancaster County, Pennsylvania. Ms. Show was brutally murdered with a knife to her neck on the morning of December 20, 1991.

Because it will be so important as the benchmark against which to measure the claims of actual innocence and prosecutorial misconduct, we will rehearse the Commonwealth's theory of the case as it unfolded in the bench trial before the Honorable Lawrence F. Stengel of the Lancaster County Court of Common Pleas, and which Judge Stengel largely adopted when he convicted Ms. Lambert.[4] We therefore begin this rehearsal with Judge Stengel's view of the facts.

Lisa Michelle Lambert was romantically involved with Lawrence Yunkin. During an interlude in their relationship, Mr. Yunkin dated Laurie Show. They apparently dated on one or two occasions during the summer of 1991. The evidence at trial made clear that Ms. Lambert reacted strongly to this development and that she expressed her anger at Laurie Show to a number of her friends. In fact, a plan was developed in the summer of 1991 that included kidnapping, harassing and terrorizing Laurie Show. Apparently, Ms. Lambert was the author of this plan and she enlisted several of her friends to execute the plan. The "kidnapping" did not happen when several of the group warned Laurie Show.

This "bad blood" continued. Ms. Lambert confronted Laurie Show at the East Towne Mall and struck her. According to the victim's mother, Hazel Show, the victim was afraid of Ms. Lambert. It appears that Ms. Lambert was stalking Laurie Show during the summer and into the fall of 1991.

On December 20, 1991, Hazel Show received a call from a person who claimed to be her daughter's guidance counselor. The caller requested a conference with Hazel Show before school the next morning. The following morning Hazel Show left the condominium to keep this "appointment." While she was gone, two persons knocked on the door of the Show condominium and entered when Laurie Show answered. A commotion followed and these two figures then left the second floor condominium, walked across a field, cut through a parking lot by some adjoining condominiums in the same complex and got into an automobile. Hazel Show waited at the Conestoga Valley High School for the guidance counselor and when the guidance counselor did not appear at the time for the appointment, Hazel Show returned by automobile to her condominium. She found her daughter laying on the floor of her bedroom, bleeding profusely from a large slash wound across her neck. Laurie whispered to her mother the words, "Michelle ... Michelle did it." Laurie Show then died in her mother's arms.

*Commonwealth v. Lambert*, No. 0423–1992, slip op. at 3–4 (Lancaster County (Pa.) Ct. of C.P. July 19, 1994) (Stengel, J.) (hereinafter referred to as "*Lambert* slip op." or "July 19, 1994 slip op.")[5]

---

**3.** Who, we learned that memorable day, are married, and therefore had no difficulty taking joint custody.

**4.** After Judge Stengel denied Ms. Lambert's motion for a change of venue, she elected to be tried before Judge Stengel, after he engaged in collo-

quy with her on the election. This aspect of the trial does not bear on our analysis here.

**5.** The notes of testimony from Ms. Lambert's criminal trial are hereinafter "Lambert Trial N.T. at ____".

At the *Lambert* trial, the Commonwealth presented much testimony regarding the "bad blood" between Lambert and Laurie Show. *See, e.g., Lambert* slip op. at 5–6 (detailing arguments between Lambert and Laurie Show). The Commonwealth also contended that Ms. Lambert bought rope and two ski hats at the KMart in the East Towne Mall the night before the murders. *See Lambert* slip op. at 6. The morning of December 20, 1991, the Commonwealth contended that Ms. Lambert took a butcher's knife from her kitchen and had Lawrence Yunkin drive her to pick up Tabitha Buck at home and take the two women to the Show condominium. Yunkin then dropped off Ms. Lambert and Buck who carried the knife and the rope to Laurie Show's condominium. Yunkin, meanwhile, went to the nearby McDonald's restaurant and had breakfast, aware only that Ms. Lambert did not like Laurie Show and that Ms. Lambert and Buck were carrying rope and a butcher's knife.

The Commonwealth and Judge Stengel placed great weight on the testimony of Mr. Richard Kleinhans, a neighbor who lived directly below the Show condominium, whom Judge Stengel described as a "disinterested third party." *Lambert* slip op. at 15. As Judge Stengel summarized Mr. Kleinhans's testimony:

> Mr. Kleinhans ... heard footsteps up the outdoor steps, heard Laurie Show's door open, heard a scream followed by a thud. After several minutes passed, he heard the door slam and heard people descending the steps. He looked out the window and saw two figures of roughly the same height and build with hoods pulled over their heads.

*Id.* at 15. Judge Stengel found that Mr. Kleinhans's testimony that he would have heard "any commotion or unusual noise from the condominium above his," *Lambert* slip op. at 9, "completely undermines the story told by Ms. Lambert." *Id.* at 16.

To hear Ms. Lambert's version, there must have been a great deal of shouting, bumping, swearing, crying, screaming and general commotion in the condominium. This was followed by, according to Ms. Lambert, her "escape" from the mayhem inflicted by Ms. Buck. As part of this "escape," Ms. Lambert related that she went half way down the staircase and sat. Then, supposedly, Mr. Yunkin ascended the steps, swore out loud when Ms. Lambert told him that Ms. Buck was in the condominium and went in after Ms. Buck.

Mr. Kleinhans testified that he heard no such commotion. Nor did Mr. Kleinhans observe three individuals. Nor did Mr. Kleinhans observe anyone the size of Mr. Yunkin. Nor did Mr. Kleinhans hear any screaming, fighting or doors slamming, other than the initial entrance and exit.

Given the court's view of the condominium [6] and Mr. Kleinhans's description of the layout of his condominium in relation to the Show condominium, his testimony is very important. By his clear factual statements, the likelihood that such a commotion, as described by Ms. Lambert, took place is extremely slight at best. Mr. Kleinhans testified as to what he heard and as to what he did not hear.[7] He offered no opinion and offered no interpretation of the events he related. He was found to be extremely credible by the court sitting as factfinder in this case. His testimony was in direct conflict with Ms. Lambert's version of the story at trial. Her version would have involved a kind of "noiseless mayhem" and this simply is not a credible story. Mr. Kleinhans was directly below, was paying attention to what was going on

---

6. Judge Stengel inspected the Kleinhans and Show condominiums during the initial trial. *Lambert* slip op. at 7.

7. We note, although this does not play a part in our decision, the following excerpts from Mr. Kleinhans's testimony at the habeas hearing:

> Examination by the Court:
> Q: I noticed in here that you have a little hard time hearing what is being said.
> A: Yes.

> Q: Back in '91, did you also have a hard time hearing as well?
> A: Not as much as now, no.
> Q: Was it okay then?
> A: It wasn't okay, But—
> Q: It was not okay.
> A: No.

Transcript of habeas corpus proceeding at 1146–47 (April 7, 1997) (hereinafter "N.T. at ____ (date of testimony)").

and remembered very clearly what he heard and what he did not hear. The lack of any commotion, crashing, shouting, stomping, yelling or other related noises renders Ms. Lambert's already incredible story completely incredible.

*Id.* at 16–18.

By contrast, at trial and before us, Lisa Lambert contended that she was an innocent bystander who watched helplessly as a "prank" spun horribly out of control at the hands of Yunkin and Buck. As she put it in her Amended Petition, and consistent with her testimony before Judge Stengel, Ms. Lambert's summary of what happened is as follows:

Lambert and Tabitha Buck ("Buck") were dropped off near the apartment building in which the victim lived by Lawrence "Butch" Yunkin ("Yunkin"), with whom Lambert was romantically involved. The plan, as Lambert understood it, was for Buck and Lambert to wait for the victim at a bus stop, surprise her, and cut off her hair. In other words, Lambert's intent was to cause the victim embarrassment as part of a teenage prank. After initially waiting at the bus stop with Lambert, Buck said that she was cold and decided to go up to the victim's apartment to bring her out. Lambert waited on an inside staircase. Lambert went into the second-floor apartment of the victim only after hearing noises which made her afraid that Buck might be in danger. However, once inside the apartment, Lambert realized that Buck had attacked the victim with a knife. Lambert attempted to drag the victim to safety, but could not overcome Buck. Lambert then fled down the staircase toward the first floor where she met Yunkin, who was on his way into the apartment. She told Yunkin that Buck had stabbed the victim, and that he had to help the victim. Yunkin then rushed into the apartment, and, along with Buck, killed the victim. In an attempt to cover for her boyfriend, and because she was a classic victim of battered-spouse syndrome, Lambert initially stated that Yunkin was not in the apartment during the killing. Subsequently, in written questions and answers exchanged by Lambert and Yunkin, Yunkin admitted that he, not Lambert, participated with Buck in killing the victim. Lambert, Buck and Yunkin all were wearing their own clothing during the events in question. Buck, on at least two previous occasions, had had violent fights with the victim. Yunkin had dated the victim on two occasions approximately six months before, had raped her on at least one occasion, and the victim had threatened to file charges against him. Yunkin also had told a friend a day before the murder—and unbeknownst to Lambert—that he would not be back at work in the future because he was going to kill someone over the weekend.

Lambert First Amended Petition at 4–5.

After her conviction before Judge Stengel, Ms. Lambert filed on July 27, 1992 her first set of post-trial motions, raising thirteen bases for a new trial. Judge Stengel denied this motion on July 19, 1994. On October 3, 1994, with her new counsel Ms. Lambert filed a second set of post-verdict motions, raising nine instances of trial counsel's ineffectiveness and two items of after-discovered evidence. Judge Stengel denied these motions on March 14, 1995.

The Pennsylvania Superior Court affirmed these orders without opinion on January 4, 1996, *Commonwealth v. Lambert,* 450 Pa.Super. 714, 676 A.2d 283 (1996) (table), and the Pennsylvania Supreme Court without comment denied Ms. Lambert's petition for allowance of appeal on July 2, 1996, *Commonwealth v. Lambert,* 545 Pa. 650, 680 A.2d 1160 (1996). She filed her first petition under 28 U.S.C. § 2254 in this Court on September 12, 1996.

*Legal Standard*

The legal polestar of our enterprise here is *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).[8] We are further guided by the Court's discussion in *Schlup* of

---

**8.** It should be stressed, however, that *Schlup* involved a *second* federal habeas petition, *see* 513 U.S. at ——, 115 S.Ct. at 857; by contrast, this is Ms. Lambert's first and only petition in federal court.

its decision in *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

We will assume, only for purposes of this discussion, that Ms. Lambert faced at least the same magnitude of "procedural obstacles" that Schlup faced, *i.e.*, that she would not be able to establish "cause and prejudice" sufficient to excuse her failure to present all of her evidence in the state system. *See McCleskey v. Zant*, 499 U.S. 467, 493–94, 111 S.Ct. 1454, 1469–70, 113 L.Ed.2d 517 (1991).[9] As will be seen, we need not reach any of these difficult questions in view of the extraordinary record of this case.[10]

In *Schlup*, Justice Stevens, writing for himself and four other Justices, held that petitioners like Schlup and Ms. Lambert may, notwithstanding any procedural default, "obtain review of his [or her] constitutional claims only if he [or she] falls within the 'narrow class of cases ... implicating a fundamental miscarriage of justice.'" *Schlup*, 513 U.S. at 314, 115 S.Ct. at 861 (quoting *McCleskey*, 499 U.S. at 494, 111 S.Ct. at 1470). In amplification of this rule, Justice Stevens wrote that:

> If a petitioner such as Schlup presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the

gateway and argue the merits of his underlying claims.

*Schlup*, 513 U.S. at 316, 115 S.Ct. at 861.

As far as the quantum of evidence necessary in such cases, the Court held that:

> For Schlup, the evidence must establish sufficient doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice *unless* his conviction was the product of a fair trial.

*Id.* at 316, 115 S.Ct. at 861–62. Thus, the Court explained,

> If there were no question about the fairness of the criminal trial, a *Herrera [v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ]-type claim would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish Schlup's innocence. On the other hand, if the habeas court were merely convinced that those new facts raised sufficient doubt about Schlup's guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error, Schlup's threshold showing of innocence would justify a review of the merits of the constitutional claims.

*Id.* at 317, 115 S.Ct. at 862.

In *Schlup*, the Supreme Court was considering the question of what burden of proof should be imposed upon a petitioner alleging

---

**9.** We should hasten to add that this assumption is by no means a foregone conclusion, and in any event respondents waived the exhaustion and default arguments when they expressly stated that relief was "warranted" in this case. N.T. at 2703 (April 16, 1997). We nevertheless address at some length in Digression 1 the respondents' extra-*Schlup* arguments, following the body of this Memorandum. It is worth noting here, however, that as noted in Digression 1, respondents concede that, at worst, Ms. Lambert has presented a "mixed" petition. She consistently has argued, for example, that she is actually innocent, and the Pennsylvania courts were presented with instances of prosecutorial misconduct such as the improper tampering with the defense expert, Dr. Isidore Mihalakis, and the First Assistant District Attorney's use of Lawrence Yunkin's perjured testimony. It is, to say the least, a nice question about what the proper disposition of such a "mixed" petition should be after Congress's adoption of the amendments to the federal habeas corpus statutes in the Anti-Terrorism and Effective Death Penalty Act of

1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1217 (1996). *See*, Digression 1 *infra*.

**10.** It is important here to stress that the Pennsylvania General Assembly in 1995 decided to kick the actual innocence ball into federal court. Before the 1995 amendment, the state Post–Conviction Hearing Act (as it was then called) excused waiver if "the alleged error has resulted in the conviction or affirmance of sentence of an innocent individual." 42 Pa. Cons.Stat. § 9543(a)(3)(iii) (Historical and Statutory Notes). The current Post–Conviction Relief Act, *adopted* ten months after *Schlup*, 42 Pa. Con. Stat. § 9543(a)(3), excuses no waivers, with *no* exception for actual innocence. *See also infra* Digression 1. Thus, Ms. Lambert has no state forum in which to raise the weighty claims she has proved beyond doubt here.

In addition, as explained below, respondents have conceded that the petitioner is entitled to relief and have thus waived the exhaustion issue.

a miscarriage of justice, including a claim of actual innocence. In *Sawyer v. Whitley*, 505 U.S. 333, 335, 112 S.Ct. 2514, 2517, 120 L.Ed.2d 269 (1992), the Supreme Court analyzed the miscarriage of justice exception as applied to a petitioner who claimed he was " 'actually innocent' of the death penalty." In this penalty phase, the Court departed from the holding in *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), and held that such a habeas petitioner "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Sawyer*, 505 U.S. at 336, 112 S.Ct. at 2517. In *Schlup*, however, the Court abandoned the *Sawyer* "clear and convincing" burden and instead held "that *Carrier*, rather than *Sawyer*, properly strikes that balance when the claimed injustice is that constitutional error has resulted in the conviction of one who is actually innocent." *Schlup*, 513 U.S. at 322, 115 S.Ct. at 865. The Court went on to explain:

> To satisfy the *Carrier* gateway standard, a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.
>
> . . . .
>
> In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial.

*Id.* at 327–28, 115 S.Ct. at 867.

Of particular relevance to this case, the Court also held in *Schlup* that for a claim like Ms. Lambert's:

> To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or

critical physical evidence—that was not presented at trial.

*Id.* at 324, 115 S.Ct. at 865.

■ In summary, therefore, the Supreme Court directed that:

> It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do.

*Id.* at 329, 115 S.Ct. at 868. As the Court noted in its mandate in *Schlup*, our enterprise in an inquiry like this is, and has been, necessarily "fact-intensive." *Id.* at 332, 115 S.Ct. at 869.

■ Since *Schlup* was decided, Congress adopted the AEDPA. *See supra* n. 9. Section 104(4) of the AEDPA, which amends 28 U.S.C. § 2254(e), would appear to raise the *Schlup* burden of proof in all cases to a "clear and convincing" threshold. The AEDPA-amended § 2254(e) provides, in relevant part:

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.
>
> (2) If the 'applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that:
>
> (A) the claim relies on—
> * * *
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

■ Because it is unclear whether *Schlup*'s burden of proof was premised upon

the Due Process Clause or upon construction of the habeas statute,[11] it is necessarily unclear whether the AEDPA is constitutional on this point. Fortunately, however, we need not reach this difficult issue here because the quantum of proof that Ms. Lambert has marshalled is so heavy that, at a minimum, she has carried her burden on all issues we address by at least the clear and convincing standard. As will be seen, there are instances where she has gone far beyond that burden, such that we no longer entertain any doubt as to the merit of her claim to habeas relief. In addition, given the nature of the prosecutorial misconduct alleged—and now proven—here—for example, obstruction of justice, perjured testimony, the wholesale suppression of exculpatory evidence and the fabrication of inculpatory evidence—we find that the factual predicates of any of Ms. Lambert's claims about which she may have failed to develop a state court record could not have been discovered through the exercise of reasonable diligence.

We should also note that under the unusual circumstances of this case, many of the claims of prosecutorial misconduct also support the claim of actual innocence. This is because this misconduct was of such materiality as to undermine our confidence in the state court's ability to perform its most fundamental function, which is to find the truth. As will be seen, none of these instances of misconduct was trivial or "technical", but all, in one degree or another, inevitably led to the creation of a wholly unreliable record of Ms. Lambert's guilt of first degree murder.

*Actual Innocence*

1. *Laurie Show Did Not Say, "Michelle Did It"*

As noted, the keystone of Judge Stengel's holding Lisa Lambert guilty of first degree murder was Laurie Show's alleged dying declaration that "Michelle did it." As Judge Stengel put it on p. 18 of his July 19, 1994 opinion, "[p]erhaps the most significant and profound testimony in this entire trial was Hazel Show's description of her daughter's dying words." This evidence was crucial because, with one notable exception,[12] there was no physical evidence linking Ms. Lambert to the murder, e.g., Ms. Lambert, unlike Buck and Yunkin, had no injuries, cuts, or bruises anywhere on her body when she was arrested the night of December 20, 1991, and the blood found on Laurie Show's ring was not of the same type as Ms. Lambert's. To the contrary, the rest of the Commonwealth's evidence stressed the defendant's alleged animus toward the victim and the implausibility of Ms. Lambert's story.

It became clear in the hearing that this keystone of the Commonwealth's case must be removed, and by that fact alone the arch of guilt collapses. Three of the emergency personnel at the scene—none of whom were called to testify at the 1992 trial or even identified to trial defense counsel—without hesitation or reservation testified that Ms. Show's left carotid artery was severed. This was also the conclusion of the Medical Examiner of Philadelphia, Dr. Haresh G. Mirchandani, and of Dr. Charles R. Larson, an expert on the mechanics of speech from Northwestern University. The expert testimony was undisputed that the vagus and laryngeal nerves run up the neck to the brain immediately beside the left carotid artery; thus, if the artery is severed, the nerve necessarily is. The severing of these nerves makes speech immediately impossible.[13]

Doctor Mirchandani, the Medical Examiner of Philadelphia, testified before us that

---

11. It does seem clear that Justice O'Connor, in her concurrence in *Herrera v. Collins*, 506 U.S. 390, 418–20, 113 S.Ct. 853, 870, 122 L.Ed.2d 203 (1993), must be correct that the execution of an innocent person would be a "constitutionally intolerable event." A life sentence for an innocent person would also not be tolerable under any notion of Due Process we are aware of.

12. *See infra* Actual Innocence Item # 3, regarding this item, which was also the subject of prosecutorial misconduct.

13. Respondents' witnesses adhere, in one degree or another, to the Commonwealth's now-discredited view. It was notable that the respondents' first witness at the hearing, Dr. Roger Irwin, did not offer a single opinion to a reasonable degree of medical certainty (indeed, the only time he offered an opinion "within a reasonable degree of medical certainty" was on cross-examination on an ancillary matter, N.T. at 2775 (April 16, 1997)). Dr. Enrique Penades's views are, to say the least, confused, and he may well have retracted most or all of his trial testimony to a reporter

Ms. Show could in any event have been conscious for no more than five minutes after her carotid artery was severed. By even the most prosecution-favoring reading of the record, much more than five minutes passed from the slitting of Laurie Show's throat to Hazel Show's discovery of her daughter.

We therefore find that Ms. Lambert has proven at least by clear and convincing evidence that Laurie Show could not have said "Michelle did it." [14]

### 2. Yunkin Confessed To The Murder

At the hearing, there was much testimony regarding what the parties have invariably referred to as "the 29 Questions." [15] Yunkin's responses to these questions show beyond any doubt that it was he, and not Lisa Lambert, who participated with Tabitha Buck in killing Laurie Show.

from the Lancaster *New Era* as reported in its April 1, 1997 edition, and as credibly confirmed on the witness stand by the reporter, Andrea S. Brown, *see* N.T. at 2351–56 (April 15, 1997). It is in any event notable that Dr. Penades, who is not board certified in pathology, is not remotely as experienced as the Philadelphia Medical Examiner. No witness for the respondents has any expertise comparable to Dr. Larson's.

While the respondents' experts, such as they were, do not come close to winning the battle of qualifications with the petitioner's, and while the respondents did not even try to rebut the testimony of the three medical personnel who by training were qualified to see that Laurie Show's left carotid artery was severed, the respondents' most persuasive evidence on this point remains the testimony of Hazel Show. At the end of her dramatic testimony—quoted in full in Prosecutorial Misconduct Item # 1, *see infra*—Mrs. Show reiterated her belief that her daughter said, "Michelle did it." *See, e.g.,* N.T. at 2703 (April 16, 1997). We have not the slightest doubt that this constitutes Mrs. Show's sincere belief. But amid the maelstrom of emotions that day, it is not hard to see how she could be mistaken—or, worse, suggested—into this belief. The earliest accounts by East Lampeter Police, as confirmed by their testimony before us, was that Hazel Show, understandably hysterical, repeated over and over, "It was a setup! Michelle did it!" *See infra* n.14 as to this point. It was at this world-ending time a small step to make her deduction into a recollection that her daughter said those words. And it is a measure of the depressing record before us that we cannot exclude the possibility that some law enforcement official suggested this small step to her.

Before beginning our canvass of the evidence on this point, we make cross-reference to the second and third items of prosecutorial misconduct, *see infra*, which document in detail the Commonwealth's knowing use of perjured testimony from Yunkin, and its egregious failure to correct the record before Judge Stengel —and us on April 16, 1997— when, for example, in Tabitha Buck's trial, several months after Ms. Lambert's, the Commonwealth freely admitted that "We've never made any bones about the fact that we feel he's [Yunkin] deceiving us about this document." [16]

A review of these "29" questions, and, most importantly, Yunkin's answers to them, leaves no doubt that Yunkin was the murderer of Laurie Show, and that his accomplice in this enterprise was Tabitha Buck, and not Lisa Lambert. Here are some of the more telling answers to Ms. Lambert's questions:

**14.** We are bolstered in this finding by the mysterious genesis of the report of the supposed dying declaration. None of the police reports from the morning of the murder, and none of the people who were in the Show condominium that morning, testified, or at the time recorded, that Hazel Show stated that Laurie *spoke* those words. *See, e.g.,* N.T. at 1548 (April 9, 1997)(Direct examination of Thomas B. Chapman); *compare* Petitioner's Exhibit 47 (Petitioner's Exhibits hereinafter "P-____") (Weaver Jan. 10, 1992 incident report of his 12/20/91 interview *with* Hazel Show's reported account, N.T. at 1563–67 (April 9, 1997)). In fact, the police reports from that time reveal that Hazel Show first reported that she had called her daughter from the High School at 7:00 a.m. and that Laurie had told her that Michelle was in the Show condominium or on the way to the condominium. These reports are indisputably false, and the Commonwealth does not now contend otherwise.

**15.** In fact, Yunkin answered 31 questions, but because of the parties' consistency in the reference to this document, which was P–119 at the hearing, we will continue to use their number. We will make a mild protest for this inaccuracy, however, by our use of quotation marks around the 29.

**16.** *Commonwealth of Pennsylvania v. Tabitha F. Buck,* No. 398–1992 (Lancaster County (Pa.) Ct. of C.P. Sept. 23, 1992), N.T. at 397 (attached to Petitioner's Appendix to First Amended Petition at Exh. 10) (hereinafter "Buck N.T. at ____").

Listen to me, I guess I won't tell on you, *BUT* · PLEASE answer these questions honestly—There are some things I need to know if I'm supposed to take the Blame for WHAT *YOU* DID!—MAIL THESE BACK TO ME

\* \* \*

9. TELL TRUTH—you ONLY *stayed* happy *Friday* [December 20, 1991 was a Friday] so I wouldn't get terrified of you. You did *because* you were *SORRY,* I know you didn't mean to KILL *and you* are sorry + guilty + feel *SORRY for* Hazel [Show, the victim's mother]— *Right?*

[Yunkin's answer:] wrong.

\* \* \*

12. WILL *you promise* TO *love* me if I lie for you?

[Yunkin's answer:] Always + Forever.

\* \* \*

14. Will *you* always stick *WITH* me *as long as I still* don't tell that *YOU* held Laurie down FOR Tabby?

[Yunkin's answer:] Will always love you.

\* \* \*

17. *Do you PROMISE to not BEAT* my face up anymore, if I lie *4 U?* That's WHY *I Had said* "I *HATED* you!" *Will* you be nice like our 1st *date?*

[Yunkin's answer:] yes

\* \* \*

20. *WHY* weren't you *sad* at all on Friday after you and Tabby killed her,— You were *happy* at Grandma's! Are you *GLAD* she is DEAD?

[Yunkin's answer:] yes, we had fun at my Grandmom's house

\* \* \*

28[b]. Are you sure that if I take the blame for you THAT *I'll* get *less time*— Absolutely sure?

[Yunkin's answer:] yes

\* \* \*

29[b]. Should I STILL cover up that *YOU helped* Tabby KILL Laurie? Are you *absolutely sure?*

[Yunkin's answer:] yes, I'm positive. P–119.

As noted, in his testimony before Judge Stengel, Yunkin claimed that the questions, and not his answers, had been altered. Not only did Mr. Kenneff fail to correct this false claim, he encouraged Judge Stengel to accept the perjured testimony that had been offered. For example, when defense counsel made a motion for mistrial on this point, rather than the prosecutor admitting that Yunkin had perjured himself, and taking the remedial action that Pennsylvania Rule of Professional Conduct 3.3(a)(4) requires, Mr. Kenneff argued to Judge Stengel that, "I think he's just as any other witness. You can believe some of it, all of it, or none." *See* Lambert Trial N.T. at 1231–32.

This prosecutorial misconduct may explain Judge Stengel's surprising description of the answers to the "29" Questions in his 1994 opinion. The Court's response to Yunkin's admissions was to write that, "somehow Ms. Lambert wants the Court to believe that Mr. Yunkin was present in the condominium that morning and that his responses in the questionnaire prove this." Slip Op. at 12. Perhaps because the Commonwealth never advised Judge Stengel of its admissions in other · proceedings about Yunkin's perjury, Judge Stengel was comfortable enough to write the sentence just-quoted. For example, Mr. Kenneff apparently never told Judge Stengel what he said at Yunkin's plea hearing, after the Commonwealth revoked Yunkin's original plea bargain (for the crime of "hindering apprehension") and entered into a second plea bargain (for third degree murder) with a far harsher sentence. At this October 10, 1992 proceeding before President Judge D. Richard Eckman,[17] Mr.

**17.** *Commonwealth of Pennsylvania v. Lawrence S.* *Yunkin,* No. 436–1992 (Lancaster County (Pa.)

Kenneff made the following flat-footed[18] statement which he never made to Judge Stengel:

> In July, 1992 [Yunkin] testified at Lambert's trial regarding testimony concerning a questionnaire that has been transported back and forth between Lambert and Mr. Yunkin at the Lancaster County prison.
>
> Experts have reviewed that questionnaire and have reviewed the testimony of Mr. Yunkin given at the Lambert trial. They advised us that his testimony at the trial regarding that questionnaire was false, and therefore it *is our opinion that he testified falsely to a material fact in one of the proceedings.* It is on that basis that we feel we are entitled to withdraw from the original plea agreement.

Yunkin N.T. at 8 (emphasis added).

The only fair reading of Yunkin's answers to the "29" Questions is that he was present at the condominium, assisted in murdering Laurie Show, and corroborated every material detail of Lisa Lambert's story at her trial. "Somehow" Judge Stengel felt able to ignore these realities, but we may perhaps hope that the only reason is because of the admitted perjury that had taken place before him.

### 3. *Ms. Lambert Did Not Wear Yunkin's Clothes*

At the trial, the Commonwealth was at pains to develop testimony regarding what, exactly, Ms. Lambert was wearing at the time of the murder. The materiality of this evidence will be found in Judge Stengel's July 19, 1994 opinion, denying posttrial motions:

> [F]or defendant [Ms. Lambert] to argue that the killer was wearing Mr. Yunkin's clothing and, therefore, must have been Mr. Yunkin is ludicrous.... The court listened to the testimony regarding the clothing ... and found there to be no question raised by the fact that the clothing appeared to be Mr. Yunkin's.

Ct. of C.P. Oct. 10, 1992), N.T. at 8 (attached to Petitioner's Appendix to First Amended Petition at Exh. 11) (hereinafter "Yunkin N.T. at ___").

July 19, 1994 slip op. at 14. As will be seen, the Commonwealth itself has radically switched its position on what, in fact, Ms. Lambert was wearing, and has itself adopted a view Judge Stengel dismissed as "ludicrous".

At trial, the Commonwealth introduced Exhibit 9, which Yunkin identified as "sweat pants that I own", Lambert Trial N.T. at 207. Since Yunkin is six foot one, the sweat pants were undisputed at the trial as ones that would fit a man of his height and build. Yunkin further testified that these sweat pants were "on Michelle on December 20, 1991" and that it was not "unusual" for Ms. Lambert to wear his clothing because she was "seven months pregnant" at the time. Lambert Trial N.T. at 208.

These sweat pants were the *only* physical evidence the Commonwealth sought to attach to Lisa Lambert that had any blood on it. Thus, if Ms. Lambert were wearing these sweat pants, she could have been close enough to Laurie Show to have absorbed blood into the fabric.

Ms. Lambert in her amended petition here, at pages 15–16, contended that "[u]nanswered by the prosecution is why Lambert would have worn Yunkin's grossly over-sized clothing, that would have severely impeded her movements, to commit a murder...." Footnote 14 after the reference to "oversized clothing" stated:

> Although Lambert was six-months pregnant at the time, news footage shows that she did not yet appear to be pregnant and had no need to be wearing such grossly over-sized clothing.

In respondents' answer to this allegation, Mr. Kenneff, the First Assistant District Attorney who tried the *Lambert* case, and who signed that answer and thereby subjected himself to Fed.R.Civ.P. 11, wrote as follows:

> The clothing fit Lambert. Attached as Exhibit 27 are photos of two women, one five (5) foot eight (8) inch tall and one five (5) foot four (4) inch tall holding the cloth-

18. The worst he would admit to before Judge Stengel was that Yunkin was "stupid, naive." Lambert Trial N.T. at 25. Of all the adjectives in English to apply to Yunkin, *naive* is among the least likely candidates.

ing. These photographs demonstrate that both items could have been worn by Lambert when she murdered Laurie Show. In fact, they establish that the sweat pants would have looked ridiculous if worn by six (6) foot one (1) inch tall Yunkin.

Respondents' Answer at 34.

Exhibit 27 to respondents' answer became sweat pants that were identified as P–725 at the hearing before us. Indeed, Lieutenant Renee Schuler swore out an affidavit on February 11, 1997 that these are "the black sweat pants recovered in connection with the investigation of the death of Laurie Show." Affidavit of Renee Schuler at ¶ 3 (attached to Respondents' Answer at Exh. 27). She further swore that these sweat pants "were *obtained from the evidence locker at East Lampeter Police Department.*" Schuler Aff. at ¶ 5. Ms. Lambert's textile and clothing expert, Mr. Hyman,[19] testified that P–725 was "boy's" sweat pants, and respondents at the hearing before us never contested Mr. Hyman's conclusion. This is unsurprising since the expert's conclusion conforms with what the respondents had pled in their answer, but not what they "proved" at trial.

The Commonwealth simply cannot have it both ways. Although it in 1992 persuaded Judge Stengel that Ms. Lambert's denial of wearing men's oversized sweat pants was "ludicrous", in its pleading before us, in its affidavit of Renee Schuler, and in the testimony of the First Assistant District Attorney before us on April 15, 1997, the Commonwealth *in 1997 says that the* sweat pants "would have looked ridiculous if worn by six (6) foot one (1) inch tall Yunkin." Respondents' Answer at 34. The only plausible conclusion from this startling about-face is that the Commonwealth itself has now conceded that Ms. Lambert was *not* wearing Yunkin's sweat pants on the morning of the murder.

This current position has at least the virtue of conforming with how the Common-wealth on record described the clothing evidence as recovered on December 21, 1991. For example, Detective Ronald Savage's report of December 21, 1991 (P–80) referred to Ms. Lambert as wearing "a pair of ladies sweat pants." The evidence log of items recovered from Ms. Lambert (P158), prepared by Lieutenant Schuler, refers to "a pair of ladies dress black sweat pants (appear small size)." And indeed the *beginning* of Ms. Lambert's purported "statement" (P–497A) records that she wore "a Bart Simpson T-shirt, stretch pants, and these white shoes and socks." By the end of this purported "statement", the Commonwealth, doubtless in some intervening time having recovered men's large sweat pants with blood on them, changed this very statement to put in Lisa Lambert's mouth that "I had different shoes (sneakers), socks, a red flannel shirt & white socks on & black sweat pants."

There is now no longer any doubt on this subject. Lisa Lambert on December 20, 1991 was wearing ladies stretch sweat pants, not Yunkin's men's extra large, and there is therefore *no* physical evidence of her ever touching any bloody part of Laurie Show. Far from being "ludicrous" or "ridiculous", Ms. Lambert's testimony on this point is entirely consistent with the size of the garments we saw at the hearing. By contrast, the Commonwealth knowingly used Yunkin's perjured evidence as well as the fabricated "statement" of Ms. Lambert (*see infra* Prosecutorial Misconduct Item # 4).

### 4. The Chief Animus Evidence Against Ms. Lambert Was A Fabrication

By far the most damning evidence against Ms. Lambert at trial regarding her animus against Laurie Show was the testimony of Laura Thomas that she heard Ms. Lambert in June or July of 1991 say she intended to "slit the throat" of Laurie Show. *See* P–375 (Statement of Laura Thomas). It is now

---

19. The parties stipulated to Julius Hyman's expertise in textiles and clothing during the hearing on April 3, 1997. As part of his testimony, Mr. Hyman meticulously compared P–725, the supposed sweat pants from the *Lambert* trial, with P–716, a sample of men's extra large sweat pants. Measuring the two in open court, it is now undisputed that P–725 is only 27 inches to the crotch, whereas P–716 was 35 inches; P–725 had a 24-1/2 inch waist while P–716 had a 30-1/2 inch waist. Mr. Hyman also testified that the distance from the crotch to the waist in P–725 was 10 inches, while in P–716 it was 15 inches.

clear that this evidence was a fabrication of Detective Savage.

No less than three of Savage's colleagues had interviewed Laura Thomas, one as early as the day of the murder, and none of their reports mentions this highly inflammatory statement. *See* P–65 (reports of Officer Flory of December 20, 1991 interview), and P–367 (Savage's report of the investigation, which at p. 35 contains Officer Bowman's interview of January 2, 1992 and Renee Schuler's of January 5, 1992). It is simply inconceivable that three reports, independent in time and place, would have omitted such an inflammatory statement if it was really made.

The first time the locution appears is in an undated "statement" of Laura Thomas. *See* P–367. This typed page and a half is signed by Laura Thomas and Detective Savage. In his testimony before us, Savage could explain none of the circumstances of his taking the "statement", even as to who typed or took it. He also expressed puzzlement about how his three colleagues omitted such an incendiary remark.

During the time the three non-inflammatory statements were taken, Savage initialled a report (P–299, dated February 26, 1992, which Officer Reed prepared) that Laura Thomas had committed the crime of false report when she reported an elaborately fabricated story of an assault and kidnapping. Thomas admitted to the East Lampeter Police that she made up this story, and conceded that she even used an onion to create tears and slapped her face to create redness. *See* N.T. at 2205–13 (April 14, 1997). The charge of false report, a misdemeanor carrying a penalty of imprisonment up to one year, *see* 18 Pa. Con. Stat. §§ 4906 (offense) and 1104(3) (penalty), was disposed of as disorderly conduct on March 9, 1992, and Laura Thomas paid a fine of $50.00 and costs of $65.00. *See* P–299.

At the hearing on April 16, Savage denied any knowledge of this false report matter, even though his initials appear n the East Lampeter Police Department report of it. He by his testimony asked us to believe that this report could have meant nothing to him at the time, even though three of his officers

had already interviewed her in the *Lambert* case which was, he admitted, by far the highest profile murder case his Department had ever participated in.

Only two conclusions are possible on this record. First, the "slit her throat" locution was Savage's fabrication. Second, Savage got it from Thomas as the *quid* for the *quo* of treating her crime of false report like a parking ticket.

In view of this sordid history, it should come as no surprise that the Commonwealth never turned over the record of Laura Thomas's false report crime to Lisa Lambert's defense, in derogation of its *Brady–Giglio* duties (*see infra* for legal landscape).

### 5. *All Known Evidence Now Corroborates Ms. Lambert's Account*

In the fourteen days of testimony before us, it was striking that to the extent documentary or physical evidence could be marshalled, it invariably confirmed Lisa Lambert's account of the case and negated the account Messrs. Kenneff and Savage put before Judge Stengel.

For example, Lisa Lambert denied ever having threatened to "slit the throat" of Laurie Show. We now know Laura Thomas never said this and that Savage made it up. *See supra* Actual Innocence Item # 4.

For example, Lisa Lambert denied that she ever altered the "29" Questions. Mr. Kenneff elicited Lawrence Yunkin's testimony to the contrary, which we now know beyond any doubt was perjury.

For example, Lisa Lambert testified that she had nothing to do with putting a rope around Laurie Show's neck or any other part of her body. A bloodhound on December 23, 1991 found the rope after being presented with Tabitha Buck's scent. *See infra* Prosecutorial Misconduct Item # 25.

For example, Lisa Lambert testified that there was blood in the hallway and on the tile floors outside Laurie Show's bedroom, and Mr. Kenneff ridiculed her for it. *See* Lambert Trial N.T. at 1283 ("Where are the blood spatters on the wall, on the ceiling, where are the blood spatters on the floor from the

severely wounded Laurie being dragged up that hallway? Where is the blood?"). The three medical personnel who testified before us confirmed Ms. Lambert's testimony about the stains and splatters of blood, see, e.g., N.T. at 169–171 (March 31, 1997) (Kathleen Harrison), as did Robin Weaver's police reports. Photographs taken by Hazel Show's insurer on December 23, 1991 confirm every aspect of this testimony. Interestingly, the Commonwealth never produced photographs of these areas to the defense. Since Mr. Hale, Ms. Lambert's expert on crime scene photography, credibly testified that such photographs would routinely be taken at a murder site like this—and the respondents' expert on impression comparisons, Dennis E. Loose, said precisely the same, N.T. at 3043–44 (April 18, 1997)—we conclude that Detective Savage and Lieutenant Schuler, the East Lampeter Police Department evidence custodians on the case from 1992 to the present, made sure the Pennsylvania State Police photos were duly "lost".

And perhaps the most powerful evidence of Lisa Lambert's punctilious honesty is on a point where her testimony was admittedly confused. Both she and Roy Shirk testified before us that Ms. Lambert had no idea where her flight from the Show condominium took her before Yunkin picked her and Buck up. This confusion is why she accepted the notion that the pick-up place was a quarter mile away from the condominium, near a wooded area as Yunkin testified.

But we know now from Hazel Show and Kathleen Bayan that Ms. Lambert was in the car when it was on Black Oak Drive, very close to the Show condominium. If Lisa

Lambert "cooked" her story, as Mr. Kenneff successfully convinced Judge Stengel, she surely would have had no confusion or error on this point, particularly since *she* testified—five years before Hazel Show confirmed it—that Yunkin was shocked to see Hazel Show drive by in the other direction. Both Hazel Show on April 16, 1997 and Lisa Lambert at her trial in 1992 testified to Yunkin pushing Ms. Lambert's head down when he saw the victim's mother.

Thus, the one aspect of Ms. Lambert's testimony that was not perfect is now seen as evidence that the rest of her account was truthful in every respect.

### 6. Yunkin's Exploitation of Ms. Lambert's Vulnerability

Regarding the testimony of Dr. Ann Wolbert Burgess concerning Ms. Lambert's being a paradigmatic battered woman at the hands of Yunkin, see N.T. at 666–919 (April 4, 1997), this testimony was dramatic and ultimately persuasive as to the diagnosis of what drove Ms. Lambert while she was under Yunkin's dark spell.[20] Suffice it to say that the record on these points bears a chilling resemblance to the pages of Krafft–Ebing[21] and Réage's *Story of O.*[22] While reasonable people may differ as to the "real" meaning of various expressions in the peculiar jailhouse correspondence between Yunkin and Ms. Lambert, we find by clear and convincing evidence that they confirm that Yunkin exploited his dominant position over Lisa Lambert to manipulate her, during a period of maximal vulnerability for her, into covering up for him until about the time of

---

**20.** The Commonwealth has from the beginning claimed that Lisa Lambert was an inherently bad person, and Ms. Lambert at the hearing adduced much evidence that she was indeed a good one. Neither view is probative of any issue we resolve here. As the Supreme Court held in *Schlup*,

> Actual innocence, of course, does not require innocence in the broad sense of having led an entirely blameless life.

513 U.S. at —— n. 47, 115 S. Ct. at 868 n. 47. To extend this point with an echo from older authority, it is clear from the other evidence in this matter that the Commonwealth is in no position here to cast any stones.

**21.** Dr. Richard von Krafft–Ebing, *Psychopathia Sexualis* 87–93 (sadism) and 127–43 (masochism)

(Dr. Harry E. Wedeck trans., G.P. Putnam's Sons 1st ed. 1965). Ms. Lambert's pornographic poem, written to Yunkin at his request when both were in prison awaiting trial (see P–457, at p. 3, "Can you write another poem?"), would serve Krafft–Ebing as a worthy case study of masochistic sex. See P–422, at p. 7.

**22.** Lisa Lambert's preference for the electric chair over the possibility of Yunkin's seeing her with undyed hair reminds one of O's suicide only upon Sir Stephen's consent. Pauline Réage, *Story of O* 203 (John Paul Hand trans., Blue Moon Books 1st ed. 1993).

the birth of her daughter in prison on March 19, 1992.

Powerful as this record is, it goes as much to Ms. Lambert's competence to assist in her own defense as it does to explaining why for so long she covered for the manipulative and odious Yunkin. Without minimizing the usefulness of this record on these points, we found the physical, documentary and scientific evidence, as well as the many instances of prosecutorial-directed suppressed evidence, to provide a firmer foundation for the other grave conclusions we have reached here.[23]

*Prosecutorial Misconduct* [24]

Before the commencement of the hearing, Ms. Lambert's counsel filed a list of allegations of prosecutorial misconduct. That list, including subparts, cited ninety-five instances of prosecutorial misconduct. We have found at least twenty-five of those allegations to have been proved at least by clear and convincing evidence, and, in their totality, we entertain no doubt at all that the trial was corrupted from start to finish by wholesale prosecutorial misconduct.

■ Since the Supreme Court decided *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), it has been firmly established that the prosecution's knowing use of perjured testimony, or of fabricated evidence, as well as its failure to take remedial measures to mitigate the damaging effects of such testimony and evidence, violates the Fourteenth Amendment's Due Process Clause. *See, e.g., Miller v. Pate,* 386 U.S. 1, 7, 87 S.Ct. 785, 788, 17 L.Ed.2d 690 (1967) (habeas relief granted where prosecution misrepresented a pair of "bloody" shorts that were actually covered with paint); *Pyle v. Kansas,* 317 U.S. 213, 216, 63 S.Ct. 177, 178–

79, 87 L.Ed. 214 (1942) (habeas corpus granted where conviction was obtained on perjured testimony and on suppressed favorable evidence); *Alcorta v. Texas,* 355 U.S. 28, 31–32, 78 S.Ct. 103, 104–05, 2 L.Ed.2d 9 (1957) (habeas relief granted where the prosecution knowingly allowed its witness to testify falsely regarding his romantic relationship with the victim).

We will consider the petitioner's allegations of prosecutorial misconduct that we have concluded she has proved by clear and convincing evidence, in much the same order as listed in her March 31, 1997 pre-hearing submission, with the important exception of the item we consider first.

### THE COMMONWEALTH'S USE OF PERJURED TESTIMONY

1. *Yunkin Did Not Drive on Black Oak Drive That Morning*

Throughout Lisa Lambert's trial, the Commonwealth was at pains to keep Yunkin as far away from the Show condominium on Black Oak Drive as possible. This may explain why the Commonwealth never disclosed to Mr. Shirk that, at least by July 5, 1992, it had identified a witness, Kathleen Bayan, who in fact saw Yunkin and his two companions driving away from the Show condominium on Black Oak Drive.

At the hearing before us, Kathleen Bayan testified that on December 20, 1991 she lived at 43 Black Oak Drive, near the Show condominium. As she was leaving that morning at 7:10 a.m.—she was quite sure of her time, because she was running late—she at an intersection saw a car driving toward her, a brown one, with three people in it. The driver was "a guy", who was motioning the

---

**23.** Regarding petitioner's evidence concerning Laurie Show writing in her own blood the initials "BY" for Butch Yunkin and "T" and "B" for "Tabitha" and "Butch", while we credit the testimony of their crime scene expert, Mr. John C. Balshy, on this point (see his testimony at N.T. at 2114–66 (April 14, 1997)), we cannot hold that Ms. Lambert has proved this aspect of her actual innocence claim by clear and convincing evidence. While the enlarged transparencies of blood stains will certainly bear the interpretation that they are inculpatating of Buck and Yunkin—and, by extension, exculpatory of Ms. Lambert—

there was enough ambiguity in the images to preclude our AEDPA-assumed proof burden.

**24.** It is important to stress at the outset that the respondents' counsel at the hearing bear no responsibility for the conduct catalogued in this section. To the contrary, Lancaster County District Attorney Joseph C. Madenspacher has acted throughout these proceedings with professional skill, punctilious regard for the Rules of Professional Conduct, and unfailing civility. We put aside his futile actions the morning of April 17 as a result of *force majeure.*

other two in the car to "get down" by pushing them on the head with his hand. According to Mrs. Bayan, the man had long curly hair. She believed the two passengers were female, although she was not sure on this point. She testified that the car "was going fast." N.T. at 924 (April 4, 1997).

In her testimony, Mrs. Bayan looked at photographs, petitioner's exhibits 728–35, and identified the automobile shown in each as the car she saw. Lisa Lambert later confirmed that this was, indeed, Yunkin's car on that day, and the Commonwealth does not dispute the issue of ownership of this car.

Mrs. Bayan also correctly identified one letter and one number of the license plate Savage and Bowman later found in the back of Yunkin's car, and which Bowman had noted down the day before the car was searched.

Mrs. Bayan testified that she had a clear and vivid recollection of these unusual events (though she admitted some vagueness about the license plates), and we entirely credit her testimony in this respect. Of gravest concern to this case, however, was her testimony that East Lampeter Police Detective Savage on July 5, 1992 interviewed her, and asked her to write down what she saw. Petitioner's Exhibit 8, Mrs. Bayan's letter to Detective Savage dated July 7, 1992, is this letter. Detective Savage, unquestionably seeking to minimize Mrs. Bayan's report, told her to write that she was "almost positive" of the events described above, but Mrs. Bayan insisted on adding that she was "99.5%" positive. Later, on July 22, Savage secured a second letter, asking Mrs. Bayan to assume that "Michelle Lambert" had testified that it was not 7:10 a.m. when she came out of the condominium. Savage's evident purpose was to try to persuade Mrs. Bayan to say that the

car she saw on Black Oak Drive could not have been Yunkin's.

According to Savage's own deposition testimony, he reported this witness's descriptions to First Assistant District Attorney Kenneff, but said that Mrs. Bayan "has an emotional problem" and had made up the story "after reading about it in the newspapers." [25] This latter part was false since the trial had not begun on July 5, 1992, and therefore nothing could have been printed about testimony in any newspaper.

Mr. Kenneff therefore knew at the time of the *Lambert* trial that evidence favorable to Ms. Lambert existed, and that this evidence corroborated her account that Yunkin was in the condominium and drove away from it with the two women in his car. His use of Yunkin's testimony on this point, as well as his failure to disclose it to the defense (*see infra Brady* violations # 19–20), unconscionably violated Lisa Lambert's due process rights.

But this aspect of prosecutorial misconduct reached dramatic and decisive proportions before our very eyes and ears beginning at 1:40 p.m. on April 16. Before quoting Hazel Show's testimony in full, we should record that it would be hard to conceive of a context that could be more confirmatory of a witness's credibility. We are sure that what Hazel Show discovered on her return home the morning of December 20, 1991 was the worst moment of her life. Mrs. Show to this day sincerely believes that "Michelle did it." Laurie Show's mother sat in our courtroom for much, though not, as will be seen, all of the testimony in this proceeding. She has every reason to want Lisa Lambert's petition denied. And so when on April 16 she became aware of what she knew for a certainty was exculpatory evidence for Lisa Lambert, Hazel Show had every reason to hold her

---

**25.** Savage testified in his deposition, at page 53, beginning at line 4:

Question: "What did you tell Mr. Kenneff about Ms. Bayan?"

\* \* \*

Answer: "I felt that she was—she had some sort of an emotional problem, a serious emotional problem. I felt that she was way less than credible, and I'm talking as an investigator now."

Quoted at N.T. at 937–38 (April 4, 1997).

Ms. Lambert's counsel asked Mrs. Bayan at the hearing before us whether "Do you have an emotional problem?" And the witness answered, "No." N.T. at 938. In her testimony before us, Mrs. Bayan was the picture of emotional normality and completely credible.

tongue. Hazel Show's conscience would not tolerate such silence, and so, visibly shattered as she spoke, she testified:

MR. MADENSPACHER: Two calls from my office on the message machine, you know call ASAP, call ASAP. And I talked to Mrs. Show, who is, you know, better now than she was then, but she's very emotional.

I think at this particular point, maybe it's best the Court just hears from Mrs. Show.

THE COURT: Will she be making representations of fact?

MR. MADENSPACHER: I would have to say that is correct, your Honor.

THE COURT: Fine.

Mrs. Show, would you kindly raise your right hand.

Do you swear to tell the truth, the whole truth and nothing but the truth, so help you God?

MRS SHOW: Yes, I do.

THE COURT: O.K. Mrs. Show, what would you like to say to the Court?

MRS. SHOW: Well, when I was sitting in the Courtroom today and listening to the testimony, I realized that I had seen Lawrence's car with three passengers drive out of our condominium complex, and a long time ago, I don't remember when, Detective Savage came to my house and we were going over some things, and he was telling me about one of my neighbors seeing Lawrence's car leave the complex, and it jogged a memory, and I said: A brownish-colored car, and he said: Well, it doesn't ... (Pause).

That I wasn't to dwell on that, because we had so many witnesses that had testified that Lawrence would have been on Oak View Road, and we didn't talk anymore about it, and I never, never jogged my memory to go further.

As I was sitting in there today, then it came back that I was going in—we have an entrance going in and one coming out, and I was going in and about three-quarters of the way in, a car was coming out, and I looked at Lawrence, there was recognition on his face, and he pushed someone with

blond hair down, and there was a dark-haired person in the back seat.

I've never heard any of—I didn't even know Kathy Bayman. I knew Elliott's mother.

MR. MADENSPACHER: Elliott is Mrs. Bayan's son.

MRS. SHOW: And Savage told me that the lady was kind of disturbed anyhow, and probably wouldn't be a reliable witness, so we were better to go with Oak View Road, because everyone had them running in that direction, and I had had—I had never met Kathy Bayman, but as Elliott's mother, I remember that she called the police and complained about Laurie picking on Elliott in the first weeks of school, and I agreed that she had a problem. I never thought anymore about it until I was sitting in there and it all—it all just came back.

MR. MADENSPACHER: Mrs. Show, were you here the day that Mrs. Bayan testified?

MRS. SHOW: no. It ran late and John and I left so that we could catch the train and we wouldn't have to take a later one.

And even yesterday, it didn't click when they were talking about the license plate or anything until today.

MR. MADENSPACHER: May I get the aerial photograph, your Honor?

THE COURT: Yes.

MR. MADENSPACHER: I brought that back.

THE COURT: I think I know enough that I can picture exactly where the witness is referring to.

It's O.K. Miss Lambert. It's O.K.

(Long Pause.)

MR. MADENSPACHER: This has not been shown to her yet.

THE COURT: O.K. This is Petitioner's Exhibit what?

THE LAW CLERK (Mr. Turiello): 736.

THE COURT: O.K. I'll get out of your way, my friend. Here. Put it where I was sitting so Mrs. Show can see it.

MR. MADENSPACHER: Well, I think we ought to ... this is the morning that

you were coming back from school, is that right?

MRS. SHOW: Yes.

BY MR. MADENSPACHER:

Q. So, were you coming up Oak View this way or this way?

A. Where's 340? The other way (pointing).

Q. Coming down?

A. That way (indicating).

Q. Yes.

A. And I would have turned right.

And somewhere near the edge of the tree line.

Q. Right in here (pointing)?

A. Yeah. I would think that was where it was.

Q. O.K. Now—

THE COURT: So the car was clearly coming out from the condominium complex?

THE WITNESS: It was—I don't remember if it had come from the right or the left.

THE COURT: Right.

THE WITNESS: But it was on the street there.

EXAMINATION BY THE COURT

BY JUDGE DALZELL:

Q. But we're agreed that this is a circle, right?

A. Yes.

Q. So the car had to be coming from the condominium complex heading out this way (pointing). Correct?

A. Yes.

THE COURT: Any other questions, Mr. Madenspacher?

MR. MADENSPACHER: No.

This is where you saw the car at that point?

THE WITNESS: I would think that it was about that, yeah.

THE COURT: And the record should reflect that Mrs. Bayan saw the car here (pointing) first, and then shortly thereafter, Miss Lambert testified that Lawrence said something like, "Oh, fuck, I just saw Hazel."

So, this testimony is totally consistent with what Miss Lambert has said since 1992.

N.T. at 2696–2701 (April 16, 1997).[26]

As noted, this evidence alone sufficed for the respondents to agree that "some relief" was "justified," N.T. at 2701, and indeed "warranted." N.T. at 2703. At this point, we addressed the District Attorney of Lancaster County and asked:

So, are we agreed that the Petitioner will tonight be released into the custody of Ms. Rainville?

MR. MADENSPACHER: I don't see how I can object to that, your Honor.

N.T. at 2704.

Although respondents' counsel tried on April 17 to retract his thrice-considered concessions on the afternoon of April 16,[27] they are bound by them. These concessions alone remove from the table the issue of Lisa Lambert's entitlement to *some* relief on her writ.

We must note here that on April 17, at the end of his testimony, we asked former Detective Savage if in 1992 Hazel Show told him about seeing Yunkin and his companions drive by her. He cooly and firmly said, "Mrs. Show never told me she saw Yunkin's car." N.T. at 2950. (April 17, 1997). In this testimony conflict between Savage and Mrs. Show, there is no contest. Hazel Show told the truth. The District Justice did not.

---

**26.** Regarding Yunkin's "look of recognition on his face" when he saw her, Mrs. Show two days later testified, "he looked directly at me and the expression on his face was that of a child caught in the cookie jar." N.T. at 3139 (April 18, 1997).

**27.** The Court of Appeals on the afternoon of April 17 denied respondents' petition for (a) "stay or vacation of the order releasing Lisa Lambert" and (b) writ of mandamus. *In re: Commonwealth of Pennsylvania*, No. 97–1280 (3d Cir. April 17, 1997).

### 2–3. The "29" Questions Were Not Altered, The Commonwealth Knew It, and Never Took Remedial Measures

As discussed in the second section regarding Lisa Lambert's actual innocence, Yunkin's responses to the "29" Questions leave no doubt that Yunkin, and not Lisa Lambert, was in the condominium with Tabitha Buck and shared in the killing of Laurie Show. As also noted in that section, Yunkin at trial claimed that the questions had been altered, thereby changing the meaning of his answers. *See* Lambert Trial N.T. at 279.

As demonstrated, Yunkin's testimony was perjured. Experts for both the Commonwealth and Ms. Lambert long ago affirmed that there was no alteration, and the Commonwealth, *after* Ms. Lambert's was convicted, admitted on the record at Yunkin's second guilty plea hearing that he had committed perjury at Ms. Lambert's trial. *See* October 10, 1992 Tr. of Yunkin's Guilty Plea proceedings before President Judge Eckman.[28] It is undisputed that Yunkin originally entered into a plea agreement, dated February 7, 1992, with the Commonwealth for the offense of hindering apprehension. Because of Yunkin's later perjury, this original agreement was revoked, and the parties entered into a second plea agreement, and the Commonwealth formally amended the information against Yunkin pursuant to Pa. R.Crim.P. 229, to charge him with the crime of murder in the third degree. At this October 10, 1992 proceeding before President Judge Eckman, Mr. Kenneff freely admitted that

Experts have reviewed that questionnaire [the "29" Questions] and have reviewed the testimony of Mr. Yunkin given at the *Lambert* trial. They advised us that his testimony at the trial regarding that questionnaire was false, and therefore it is our opinion that he testified falsely to a material fact in one of the proceedings. It is on that basis that we feel we are entitled to withdraw from the original plea agreement.

Yunkin N.T. at 8.

Under these circumstances, the Commonwealth had an unambiguous ethical obligation to take remedial action with the court that tried and convicted Lisa Lambert concerning Yunkin's patent perjury. Pennsylvania Rule of Professional Conduct 3.3(a)(4) provides that: "A lawyer shall not knowingly ... offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures."

Far from complying with Rule 3.3(a)(4), Mr. Kenneff encouraged Judge Stengel to accept Yunkin's perjured testimony. At the close of the trial, Ms. Lambert's defense counsel, Mr. Shirk, moved for a mistrial based on Yunkin's obvious perjury regarding the authenticity of the "29" Questions. The Commonwealth, rather than admitting this perjury and taking the necessary remedial action, instead argued to Judge Stengel that: "I think he's just as any other witness. You can believe some of it, all of it, or none." *See* Lambert Trial N.T. at 1231–32. Mr. Kenneff thus advised Judge Stengel that he was free to believe testimony that Mr. Kenneff himself knew was perjured and, as a result of which, caused him to revoke Yunkin's earlier plea bargain.

Judge Stengel took the bait Mr. Kenneff offered him. The trial judge stated on the record that he would weigh the expert testimony regarding the authenticity of the document, which the Court believed it was "not bound to [accept] merely because he's an expert," Lambert Trial N.T. at 1232. The Court also stated, with regard to Yunkin's testimony regarding the alterations, "he [Yunkin] stood by [it]...." *Id.* at 1233.

It is illuminating to contrast Mr. Kenneff's behavior in the *Lambert* trial with what he said to the Court that tried Tabitha Buck. During *that* trial, which took place in late September of 1992, Mr. Kenneff attempted to use the "29" Questions as a sword to demonstrate Tabitha Buck's guilt. When Buck's counsel objected, Mr. Kenneff misrepresented to Buck's trial court at sidebar, and outside the presence of the jury, that "We've never made any bones about the fact that we

---

**28.** These excerpts were attached as Exhibit 11 to the Appendix to the First Amended Petition, and are quoted *supra* in the text in Actual Innocence Item # 2.

feel he's deceiving us about this document." Buck N.T. at 397.

There is no ambiguity on this record that Mr. Kenneff knew that Yunkin committed perjury on a material issue, regarding a document that established Lisa Lambert's innocence. Instead of informing Judge Stengel that the Court could *not* accept Yunkin's testimony on that crucial document, Mr. Kenneff instead advised Judge Stengel that he was free to accept *all* of Yunkin's testimony, while conceding in other courts that Yunkin had lied. Worse, after obtaining this conviction of an innocent defendant based on the perjured testimony of one of the real murderers, the Commonwealth through First Assistant District Attorney Kenneff cooly proceeded to seek the death penalty against her.

Notably, the Commonwealth has never in any proceeding until April 16, 1997 conceded that Yunkin committed perjury on the "29" Questions that confirm Lisa Lambert's innocence. To the contrary, in derogation of Fed.R.Civ.P. 11, as well as of any fidelity to the truth, Mr. Kenneff, the author of respondents' answer to the first amended petition, proffered to this Court what he knew to be a false filing. At pages 41 through 42 of the respondents' answer, and at Exhibit 29 thereof, Mr. Kenneff proffered the statement of Susan Irwin. Irwin had retrieved the "29" Questions document out of the binding of the law library book, and returned it to Ms. Lambert. At page 42 of the respondents' answer, Mr. Kenneff wrote:

> Prior to returning it Irwin examined portions of the questions and answers and noted that the questions were written in pen and pencil alternately this [*sic*] corroborates Yunkin's testimony at Lambert's trial. The pencil was written so lightly that Irwin had to scrutinize the penciled-in writing to be able to read what was said.

As noted, the question of whether there was any "pencil" was definitively resolved before the end of the *Lambert* trial. Apparently assuming we would fail to notice this reality, Mr. Kenneff went on to write on the same page of respondents' answer:

> Irwin stated this paper is not as the original appeared 'it was changed, if it indeed it is the original, it was changed.'

*Id.* Thus, Mr. Kenneff continued in this Court to proffer the notion that Yunkin was right that the document was "changed" when the First Assistant District Attorney at all times knew perfectly well that is totally false.

This arrogant persistence in the knowing use of what was long ago a wholly discredited position demonstrates prosecutorial misconduct at its worst, and misconduct that palpably offended the Due Process Clause and aided in the conviction of an actually innocent defendant.

Indeed, the degree of Mr. Kenneff's bravado and incorrigibility on the issue of his remedial duties under Rule of Professional Conduct 3.3(a)(4) was dramatically illustrated when on redirect examination before us the morning of April 16, 1997, he was asked whether he would take such remedial action then and there regarding the Sharon Irwin report of "pencil". Under oath, saying that he still believes "that there is some type of tampering" with the "29" Questions, N.T. at 2626 (April 16, 1997), Mr. Kenneff would not make the retraction. *See* N.T. at 2627. Mercifully, the District Attorney of Lancaster County, Mr. Madenspacher, *did* at last take such action—"MR. MADENSPACHER: Yes, Your Honor, we retract it", N.T. at 2628—and thereby repudiated the Irwin report, the representations Mr. Kenneff wrote on page 41 and 42 of the answer, and his First Assistant's testimony before us.

*4. Testimony Regarding Lambert's Attire*

We have already, in Actual Innocence Item # 3, *supra*, canvassed at length the record regarding Ms. Lambert's attire on the morning of the murder. That description will also serve as conclusive evidence of the Commonwealth's knowing use of false evidence on a crucial point.

It is important to stress that many in the Commonwealth's prosecution team had to have known from their own contemporaneous records that Lisa Lambert was not wearing what, for her, would have been clown-sized garments during the course of what the Commonwealth depicted as a callous murder

plot. Not content with this known use of false physical evidence, Mr. Kenneff and his trial team elicited from Yunkin palpably false testimony. Contemporaneous news footage demonstrates that Lisa Lambert was not showing her pregnancy at the time of her arrest. Lieutenant Schuler, who saw Ms. Lambert in an undressed state the morning of December 21,[29] testified to the same effect. Since we know that Lisa Lambert gave birth to a full-term baby on March 19, 1992, she was six months' pregnant on December 20, not "seven" as Yunkin was allowed to testify.

### 5. Presenting Perjured Testimony Regarding the Pink Trash Bag

At the hearing on April 2, 1997, Lancaster County District Attorney's Office Detective Ronald C. Barley testified at length. He was deeply involved in the "investigation" of Ms. Lambert's case, and on December 23, 1991, was part of a team that went to the Susquehanna River bank to look for evidence.

Ms. Lambert testified at her trial that Yunkin had put his sneakers, and other items, in a pink trash bag and that she tried to toss the bag into the river for him, but it did not go far. At her trial, the Commonwealth made much of the fact that no such trash bag was ever found at the river.

Detective Barley reiterated the trial line when he testified before us. He was unaware of the fact that we saw the unedited version of the twelve and a half minute video that "Smokey" Roberts made of the river search. See N.T. at 345–79. This was not the soundless, eight minute edited version of the tape provided to Mr. Shirk.[30] On the tape, Detective Barley is seen on the river's edge, standing over a pink bag. Notably,

when he is first seen on the tape, he looks directly at the cameraman and waves him to stop filming. There is then a break in the continuity. The next time the pink bag is seen on the original tape, it is empty.

Officer Reed of the East Lampeter Police Department testified before us on this same subject on April 14. He also testified in a deposition in this matter on March 13, 1997. On both occasions, he testified that no pink bag was found. When he saw and heard Smokey Roberts's tape, he affirmed that it was his voice on the soundtrack saying, "What do you got, a bag?" N.T. at 2227 (April 14, 1997). He then testified that he "forgot" the discovery of the pink bag, even though his report prepared two days after the river search (P–295) also failed to mention this important fact.

It is evident from this tape that Barley committed perjury at Lisa Lambert's trial and Reed almost certainly committed perjury before us and at his deposition. Both were not only present at the river search, but unquestionably saw the pink bag recorded on the videotape.[31]

### 6. Presenting Perjured Testimony from the Police about Lambert's Admission that She Was Wearing Yunkin's Black Sweat Pants and Flannel Shirt

Chief County Detective Raymond E. Solt allegedly took Ms. Lambert's "statement" over the course of several hours between 2:00 a.m. and 8:00 a.m. on December 21, 1991. As noted earlier regarding the testimony concerning attire, Chief Detective Solt's "statement" from Ms. Lambert was on its face internally inconsistent. See P–497A. This

---

**29.** Officer Schuler's report of this physical inspection was Petitioner's Exhibit 609, which noted only a "very faint and small red mark located below her right inner elbow" as the *only* mark on her body. It is undisputed that this mark had nothing to do with the events of December 20, 1991. By contrast, Officer Schuler's report of a similar physical view of Tabitha Buck, *see* P–608, demonstrates a multitude of scratches, though none are noted on her face. Mug shots taken of Buck that morning, however, unambiguously depict such scratches, *see* P–546 and P776.

**30.** Indeed, Mr. Roberts possessed the original of this tape, and Lisa Lambert's indefatigable trial

team in this matter were able to determine that Mr. Roberts still retained it.

**31.** Barley's apparent perjury continued, in our view, in his testimony before us, as we will detail in Item 12 regarding the edited audiotape of Yunkin's February 4, 1992 statement. The combination of these instances of what seemed to us to be possible perjury led us to call that fact to the Commonwealth's attention, and we will shortly provide copies of the transcript to the United States Attorney so that he may decide whether Barley and Reed should be prosecuted federally for their untruthful statements before us.

statement begins with Ms. Lambert admitting she wore a Bart Simpson T-shirt and turquoise stretchpants and ends with her wearing Yunkin's black sweat pants and red flannel shirt. This important change in the "statement" appears on a page written entirely in Detective Solt's hand. *See* P–497A at page 7.

In some of his fantastic testimony before us, Chief Detective Solt claimed that he did not follow up on the obvious inconsistency in the "statement" because he was "just writing at all down." Although he testified that he has received special training in interrogation techniques and is, indeed, a specialist at that task for the Lancaster County District Attorney's Office, he still sought to have us believe that this important inconsistency did not trouble him the morning of December 21, 1991—and still doesn't.

Chief Detective Solt could also not explain why the last two pages of the statement were in his handwriting rather than typed as the first six pages were. Indeed, the last page was photocopy paper, rather than the bond paper on which the typewritten "statement" had been taken down. The Chief County Detective offered no sensible explanation whatever as to (a) the change in paper, or (b) why the "statement" went from being typed to being in his own hand or (c) why the handwriting went from block letters to cursive.

We heard the expert testimony of William J. Ries, a "forensic document examiner" who has participated in examining documents in over 5,000 cases for the Philadelphia and surrounding counties District Attorney's Offices, including the Lancaster County District Attorney's Office. His testimony on April 2, 1997 confirmed that the "statement" was "unique" in the peculiarities already noted. The testimony confirmed our conclusion that the "statement" was a fabrication, and that Chief Detective Solt knew it when he testified both in the *Lambert* case and before us.[32]

### 7. *Altering the Crime Scene to Fabricate Photographs* Depicting the Telephone Wrapped Around the Victim's Leg

Oddly, some of the photographs used at the *Lambert* trial show a telephone cord wrapped around Laurie Show's right leg. There is no question at all that these photographs are of the crime scene as altered in order to substantiate the Commonwealth's theory at trial that Ms. Show's legs were tied up and held down as Lisa Lambert slit her throat.

Not a single witness who testified at the hearing, and who was present immediately after Laurie Show's murder, ever saw a telephone cord wrapped around her leg. None of the medical personnel on the scene saw any cord around the leg. To the contrary, Charles R. May, a certified paramedic on the scene, testified that he checked the decedent's feet and toenails and saw that the latter were blue. *See* N.T. at 193 (March 31, 1997). He did not recall seeing a telephone cord around those feet, N.T. at 194, nor did Mr. Zeyak (N.T. at 148) (March 31, 1997), nor did Ms. Harrison (N.T. at 172) (March 31, 1997).

Even Robin Weaver, the East Lampeter police officer who Detective Savage put in charge of the scene, confirmed the absence of such a cord. Weaver made no less than three sketches of the crime scene. All of them show the telephone on the floor some distance from the victim's body.

No other conclusion is possible from this evidence than that the photographs used at the *Lambert* trial were fabrications.

### DESTROYING EVIDENCE FAVORABLE TO LAMBERT

█ It is well-settled that where law enforcement authorities fail to preserve evidence favorable to a defendant, the value of which being apparent at the time of its destruction, and where that defendant is unable to obtain comparable evidence by other means, relief on habeas corpus is warranted.

---

**32.** There is a line in a witness's testimony between exaggeration and perjury. Chief County Detective Solt's testimony under very close questioning by Ms. Lambert's counsel seems to us to have gone well beyond that line, so we will refer his testimony to the United States Attorney for determination as to the proper course of action.

*See California v. Trombetta,* 467 U.S. 479, 488–89, 104 S.Ct. 2528, 2533–34, 81 L.Ed.2d 413 (1984); *United States v. Agurs,* 427 U.S. 97, 109–10, 96 S.Ct. 2392, 2400–01, 49 L.Ed.2d 342 (1976).

This rule is particularly applicable where the failure to preserve, or destruction of, evidence is the result of bad faith on the part of the officers. As will be seen, such bad faith is in ample supply here.[33]

### 8. *Yunkin's Earring Back, Containing Skin And Hair, Found on the Victim During The Autopsy*

Even Detective Barley admitted in his testimony that Yunkin wore an earring, and that a matching earring back was found in Laurie Show's hair. And yet, after Ms. Show's autopsy, this earring back "disappeared", and no one in Lancaster County who was involved for the Coroner's Office or the prosecution team can seem to remember what happened to this highly-inculpatory evidence against Yunkin—evidence again corroborative of Ms. Lambert's account. The last reference to this critical evidence is in Detective Savage's February 7, 1992 report (P–190) when he stated, "Said earring will be kept in the ELTPD [East Lampeter Township Police Department] evidence room" of which Savage was the then custodian.

There are, by now, many candidates who would cheerfully have done their perceived duty. All we need hold here is that all of these candidates worked for some level of law enforcement in Lancaster County.

### 9. *The Pink Garbage Bag and its Contents*

As noted regarding Item # 5 of prosecutorial misconduct, a videotape exists that shows beyond any doubt that a pink garbage bag *was* found on the banks of the Susquehanna

River on December 23, 1991. It is not contested that the Commonwealth did not preserve this pink garbage bag or its contents notwithstanding this obvious existence, most notably a white high-top sneaker that Barley denied finding when he testified at the *Lambert* trial, Lambert N.T. at 144, but admitted finding when he testified before us. *See* N.T. at 969–70 (April 7, 1997).[34]

This absence is particularly notable when coupled with what seemed to us to be perjured testimony from the witnesses before us. For example, although Detective Reed was present for the river search, he testified both in his March 13, 1997 deposition, and before us on April 14, that no pink plastic bag was found at the river's edge. When confronted with the video showing the pink bag at the search scene, Officer Reed suddenly recalled that he "forgot" this fact, and left it out of the report he wrote only two days after the search contained in Petitioner's Exhibit 225. Reed was also able to identify Detective Barley on the tape, and Officer Yost (who now works for the Lancaster City Police Department) looking at the pink bag on the water's edge.

### 10. *Solt's Notes Of His Interview With Lambert*

By now it will come as no surprise that Chief County Detective Solt did not preserve his "notes" of Ms. Lambert's fabricated "statement." Review of the next two items of physical evidence may explain why Solt did not make the same "mistake" his colleagues did with the edited videotape and audiotape.

### 11. *Four and a Half Minutes of Videotape of the Search of The River*

As noted above at Prosecutorial Misconduct Item # 5, approximately four and a half

---

**33.** Besides being the principal officer in charge of the investigation—the equivalent of the case agent in federal prosecutions, *see* N.T. at 2948–49 (April 17, 1997)—Savage was the evidence custodian of the East Lampeter Township Police Department. *See* N.T. at 2932. Thereafter, Lieutenant Renee Schuler became custodian, and in 1997 Mr. Kenneff put her in charge of gathering the photographs and other documents for this case. *See* N.T. at 2288–93 (April 14, 1997). Thus, the culpability for the failure to

preserve, or destruction of, the cited evidence begins with these two law enforcement officials.

**34.** With a straight face, Barley looked up to us from the witness stand and said, "The reason being, I completely forgot about that sneaker." N.T. at 970 (April 7, 1997). We are not inclined to suppose that Barley's is the only human memory better five years after an event than it is seven months after it.

to five minutes of Smokey Roberts's video-tape of the search of the river was not made available to Mr. Shirk. But for the efforts of Ms. Lambert's present counsel, no one would have ever known that the tape given to the defense was so much shorter than the original tape Mr. Roberts took on or about December 23, 1991.

Viewing the original tape in its entirety, and comparing it to the edited tape, it is apparent why the tape was altered. For example, the unambiguous sight of Detective Barley waving away the cameraman has been edited out, as was the portion of the tape immediately before showing Barley's discovery of the pink bag. No effort was made to reproduce the sound, doubtless to conceal Reed's shouted, "What do you got, a bag?"

In his testimony before us on April 14, Reed suggested that Mr. Roberts edited the tape without any supervision from law enforcement authorities. Besides being a fantastic proposition on its face, this testimony contradicts Mr. Roberts's testimony that he did not edit the tape.

It now should come as no surprise why this inconvenient tape was so carefully edited. Its obvious effect was to mislead Roy Shirk and, by his testimony, the scheme was wholly successful until now.

Notably, respondents made no effort at any time during the hearing to explain why this wholesale editing occurred. ·

**12. *One Hundred and Fifty–Eight Seconds Of The Audiotape Of Yunkin's February "Statement"***

In his testimony on April 2, Barley recounted the taking of the "statement" from Lawrence Yunkin, in the presence of Detective Savage, on February 4, 1992. The actual audiotape of Yunkin's "statement", *see* P–661, was heard during the hearing, and demonstrates beyond any doubt that Yunkin's "statement" was not the verbatim transcript it purported on its face to be.

To the contrary, repeatedly during the tape one could hear the tape recorder being turned on and off. Most bizarre of all, midway through the tape there were one hundred fifty-eight seconds of echoic noise of

someone speaking, perhaps a female, but certainly not Yunkin. When the audiotape gets to the point recorded on the alleged "transcript" where, in an earlier report, Barley had noted that Yunkin said he had an earring like the one found in Laurie Show's hair, the audiotape manifestly stops for an edit. Although the typewritten statement of Yunkin shows, only a few lines before, that Detective Barley was present, he testified before us that at the precise moment when Yunkin's audiotape has an abrupt edit—at the very point where Yunkin almost certainly mentioned his earring—Barley just "disappeared". Indeed, in answer to our questions, he said that he "appeared" and "disappeared" at intervals, rather like a will 'o the wisp, during Yunkin's statement.

Later in the tape, Barley was asked whether he agreed with petitioner's counsel that "there was laughter" in the background of the tape. Barley admitted that "I heard some laughter, yes." N.T. at 652–53 (April 2, 1997). One can only conclude, with Ms. Lambert's counsel, that this "laughter" was for the simple reason that, despite all the stopping and starting on the tape, Yunkin still could not get his heavily-coached story straight.

### ALTERING EVIDENCE

**13. *Altering The Crime Scene***

*See supra* Prosecutorial Misconduct Item # 7.

**14. *Deliberately Altering Lambert's Written "Statement"***

*See supra* Prosecutorial Misconduct Item # 4 and Actual Innocence Item # 3.

**15. *Altering Yunkin's February 4 Statement To Remove Obvious Lies; And Deleting Same From Audiotape Of Statement***

There is no point here in repeating what is detailed at length in Prosecutorial Misconduct Item # 12, *see supra.* Putting aside the obvious doctoring of reality that the stop-and-start audiotape, with its 158–second gap, documents, even Barley admitted on the witness stand that Yunkin had said he wore an

earring such as was found in Laurie Show's hair, N.T. at 625 (April 2, 1997), and this is not on the audiotape or recorded in the statement.

■ Given the many edits in the tape, we have no doubt that other deletions were no less material. On this record, the burden shifts to the Commonwealth to explain what was said during those gaps. Its counsel scarcely tried.[35]

## WITNESS TAMPERING

16. *Tampering With Ms. Lambert's Expert Witness*

It is undisputed that the Assistant District Attorney in charge of the *Lambert* case, John A. Kenneff, Esq., talked with the defense expert, Dr. Isidore Mihalakis, without the consent of Ms. Lambert's chief defense counsel, Roy Shirk, Esq. Indeed, Mr. Shirk explicitly refused to allow Mr. Kenneff to make this contact, when Mr. Kenneff raised the subject with him.

There is also no question (although there is some dispute about details) that Mr. Kenneff's contact with Dr. Mihalakis was anything but perfunctory. According to Dr. Mihalakis's testimony, Mr. Kenneff was "displeased and disappointed" that he was testifying for. the defense, N.T. at 1826–27 (April 10, 1997), allegedly because Mr. Kenneff did not want his cross-examination of Dr. Mihalakis to "jeopardize" Dr. Mihalakis's relationship with the Lancaster County District Attorney's Office. *See* N.T. at 1827. In this respect, Mr. Kenneff exhibited concern about "future cases" if Dr. Mihalakis testified at the *Lambert* trial. *See* N.T. at 1829.

After a good deal of evasion, Dr. Mihalakis finally admitted that he did discuss "the autopsy" with Mr. Kenneff, and that "he [Kenneff] asked what I thought" about it. N.T. at 1830. He further admitted that Mr. Kenneff discussed Dr. Mihalakis's anticipated testimony with him, and even went so far as to answer cross-examination questions from the prosecutor. *See* N.T. at 1834–35.

In response to Mr. Kenneff's expressions of displeasure and disappointment, Dr. Mihalakis also admitted that he offered to Mr. Kenneff to withdraw from the defense team. *See* N.T. at 1830–31. The witness reported that Mr. Kenneff said words to the effect that he did not want to delay the trial. *See* N.T. at 1832.

To Roy Shirk's great surprise, when it came time to put Dr. Mihalakis on the witness stand, Dr. Mihalakis would *not* rule out the possibility that Laurie Show said "Michelle did it" to her mother before dying. As already mentioned, this evidence was at the heart of both the Commonwealth's case and Judge Stengel's finding of guilt. As Judge Stengel himself described the testimony, "Dr. Mihalakis did nothing to impugn the credibility of Hazel Show's description of her daughter's dying words." *Lambert* slip op. at 18.

Before Dr. Mihalakis took the witness stand, Mr. Shirk had filed a motion with Judge Stengel to declare a mistrial because defense counsel had learned, perhaps from Mr. Kenneff himself, of the unauthorized contact. Upon Dr. Mihalakis's soothing representation to the Court that he would not vary from what he had said in his June 29, 1992 preliminary report, Judge Stengel denied the motion. When Dr. Mihalakis not only supported the Commonwealth's theory, but negated a defense that he himself had suggested in his June 29, 1992 preliminary letter to the defense, Mr. Shirk realized the magnitude of this betrayal. Indeed, Mr. Shirk credibly testified that he would never have called Dr. Mihalakis had he any inkling that he would so far depart from what Dr. Mihalakis and he had twice discussed on the telephone after the June 29, 1992 preliminary letter.

The evidence showed that Dr. Mihalakis's performance had a dramatic effect on his

---

**35.** In his closing argument, respondents' counsel suggested these gaps were to enable Yunkin to go off-the-record to conference with his lawyer, who was present, and based his suggestion on Savage's testimony to this effect. N.T. at 2875 (April 17, 1997). Like so much of Savage's testimony, this, too, is manifest fiction. If all these gaps were indeed for such conferences, surely at least *one* would be preceded by at least a word or two of request. Savage's story also fails to account for a nine-second gap, silent except for an audible cough, immediately before the bizarre hundred and fifty-eight second portion begins.

fortune. Petitioner's Exhibit 91 canvasses Dr. Mihalakis's income from Lancaster County. In the three years before he testified in the *Lambert* case, he had been paid as follows from both the District Attorney's Office and Coroner's Office of Lancaster County:

| 1989 | $ 6,816.00 |
| 1990 | $ 7,540.00 |
| 1991 | $ 9,012.00 |

In the year of his testimony, Dr. Mihalakis was paid $11,829 from the County. In 1993, the year after his testimony, the total nearly quadrupled, to $41,919.[36]

In a moment of unguarded candor, Dr. Mihalakis admitted that he knew he should not consult with the opponent of the attorney who retained him. *See* N.T. at 1821. He agreed that it is, as the English say, "just not done." He claimed, however, that he made "a reasonable inference" that Mr. Kenneff had satisfied "certain protocols" before telephoning him, *see* N.T. at 1822, 1823, although he admitted that Mr. Shirk had never directly suggested anything of the kind to him.

■ Dr. Mihalakis's understanding that this conduct is "just not done" is in perfect congruity with the rules that Mr. Kenneff so wantonly broke. As Professor Charles Wolfram, Chief Reporter of the *Restatement of the Law Governing Lawyers* testified, it is a "no-brainer" that a prosecutor simply does not make an *ex parte* communication with a defense expert without the explicit consent of defense counsel. N.T. at 1007, 1013–14 (April 7, 1997); N.T. at 1014 ("Clearly, there

is a wall against contacting experts"). In response to our question, he said that he had *never* in his long experience ever heard of a prosecutor who did anything like this. *See* N.T. at 1015.

This is not surprising. Rule 8.4(d) of the Rules of Professional Conduct forbid actions which are "prejudicial to the administration of justice." In Pennsylvania, the *only* way a retained expert can be consulted in a criminal case is pursuant to the rigors of Pennsylvania Rule of Criminal Procedure 305.[37]

There is no question that Professor Wolfram was right that violation of these rules create circumstances which are "rife with the possibility for corruption of the testimony." N.T. at 1000. Much worse, precisely such corruption occurred here.

It is untenable to suggest that there is nothing material in the change in Dr. Mihalakis's testimony after Mr. Kenneff spoke to him. We totally credit Roy Shirk's testimony that he would never have retained Dr. Mihalakis if he knew that his own expert would help the Commonwealth dig much of Lisa Lambert's grave. This "no-brainer" violation by Mr. Kenneff, *see* N.T. at 1007, thus corrupted the record on the most crucial evidence in the case, Laurie Show's alleged dying declaration.[38]

There is also no doubt that Dr. Mihalakis knew who buttered his bread. He admitted in answer to our questions that Mr. Kenneff, who handled most of the homicide cases for the Lancaster County District Attorney's Of-

---

**36.** After it became clear in post-conviction proceedings that Dr. Mihalakis was a problem for the Commonwealth, his fortune with the County quickly reversed:

| 1994 | $5,200.00 |
| 1995 | $ 800.00 |
| 1996 | –0– |

*See* P–91 and N.T. at 1860–63 (April 10, 1997).

**37.** This Rule, at subpart C(2)(a), permits the Commonwealth, on "motion for pretrial discovery," to obtain leave of Court to obtain "results or reports of ... scientific tests or experiments ... which the defendant intends to introduce as evidence in chief, or which were prepared by a witness whom the defendant intends to call at trial." The federal analogue to Rule 305 is Fed. R.Crim.P. 16 and, especially, subpart (b)(1)(C) thereof.

**38.** In his testimony before us on April 15, 1997, Mr. Kenneff offered the preposterous notion that his conduct regarding Dr. Mihalakis was entirely excused because, in truth, Dr. Mahalakis was the *Commonwealth's* witness by virtue of the non-exclusive contract that had been entered into with him on April 8, 1992. *See* P–87 (contract). It is hard to reconcile this testimony with the fact that Mr. Kenneff admittedly sought Mr. Shirk's consent to speak with Dr. Mihalakis, and with the fact that he did not stake out this extravagant position when Mr. Shirk raised this issue before Judge Stengel. Indeed, the whole of Mr. Kenneff's testimony before us confirms his utter incorrigibility. This reality has consequences addressed in the next footnote.

fice, was a much more fertile source of business than Roy Shirk ever could be. Indeed, only the most unworldly observer would not see a *quid* from the *quo* of Dr. Mihalakis's altered testimony from the following schedule of his compensation from Lancaster County:

| | |
|---|---|
| 1989 | $ 6,816.00 |
| 1990 | $ 7,540.00 |
| 1991 | $ 9,012.00 |
| 1992 | $11,829.00 |
| 1993 | 41,919.00. [39] |

### BRADY AND GIGLIO VIOLATIONS

In his testimony before us on April 11, Ms. Lambert's trial counsel, Roy Shirk, Esquire, identified no less than thirty-seven unprivileged evidentiary items that the Commonwealth had in its possession—each to one degree or another favorable to Ms. Lambert—but failed to disclose to him. As will be seen from the following canvass of these items, many of them would alone constitute violations of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See also Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (requiring disclosure of evidence regarding the credibility of the witness that may be determinative of guilt or innocence); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) (nondisclosure of evidence affecting credibility constitutes a denial of due process).

 Under *Brady*, evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v.*

*Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). Taken together, these undisclosed items would not only radically have affected the defense at Ms. Lambert's trial (as Mr. Shirk emphatically testified before us), but would, in their totality, have affected the entire truth-gathering enterprise before Judge Stengel.

As under *Schlup*, 513 U.S. at ——, 115 S.Ct. at 862, so under *Bagley* we hold by this clear and convincing evidence that our confidence in the outcome of this trial is utterly undermined by these nondisclosures.

**17–18.** *Failure To Disclose the Identity of Medical Personnel At The Scene, And That They Saw The Carotid Artery Severed*

Perhaps no failure was more material than the Commonwealth's non-disclosure of the identity of the medical personnel who came to the Show condominium. We now know from the testimony before us of three of them, Kenneth M. Zeyak, Kathleen Allison Harrison and Charles R. May, that all saw that Laurie Show's left carotid artery was severed. We also now know that this fact alone would have made the dying declaration physically impossible.

In his testimony before us on April 11, Mr. Shirk credibly explained that, based on what he knew at the time of trial, the dying declaration was a given that he had to explain away. His defense, he credibly testified, would have been radically different had he known of the dying declaration's impossibility through the evidence these three undisclosed witnesses would have provided.

There is no need here to repeat the scientific consequences of this evidence addressed

---

**39.** As noted regarding Mr. Kenneff's knowing use of Yunkin's perjured testimony, he was indifferent at best to his responsibility under Rules of Professional Conduct 3.3(a)(4) and 3.8(d). Coupled with his egregious misconduct with Dr. Mihalakis in violation of Rule 8.4(d), Mr. Kenneff's behavior was so unprofessional, and contrary to the Rules of Professional Conduct, that we will refer this matter to the Disciplinary Board of the Supreme Court of Pennsylvania for further action. His *animus* before us in pretrial proceedings, and especially toward petitioner's counsel during the pre-hearing phases of this case, suggests not only a lack of remorse but incorrigibility.

Nothing can equal Mr. Kenneff's steadfast refusal to retract his lies to us about the use of "pencil" on the "29" Questions, both *under oath* on the witness stand on April 16 and in his assertions on pp. 41–42 of Respondents' Answer.

Because it is also difficult to reconcile Mr. Kenneff's position in 1992 that Ms. Lambert was wearing extra-large men's sweat pants with his testimony before us that she wore P–725, a boy's size, it would appear there is further basis to warrant referral of this testimony to the United States Attorney's Office to determine whether any action is appropriate.

in the first section of our Actual Innocence section, *see supra*. It bears repeating, however, that this evidence was outcome-determinative.

It is also worth noting that Savage fabricated his "interview" notes of these personnel. We completely credit the testimony, for example, of Kenneth M. Zeyak who on March 31, 1997 said that he was never interviewed by Savage or any other officer about Laurie Show's murder. *See* N.T. at 152–53. Savage's report, P–363, is thus a fiction.

19–20. *Failure to Disclose that Kathleen Bayan Saw Yunkin Driving his Car on a Street He Said He Was not on, Saw Three People in Yunkin's Car that Morning, and Yunkin Pushing Heads Down*

We need not rehearse again Prosecutorial Misconduct Item # 1, *see supra*, regarding what Kathleen Banyan saw on December 20, 1991. Savage told Mr. Kenneff about Mrs. Bayan's account. Mrs. Bayan's account confirmed Ms. Lambert's, both as to placing Yunkin in the condominium complex and as to his pushing her head down as he drove away. Putting aside the prosecutor's allowing Yunkin to perjure himself about being away from Black Oak Drive, Mr. Kenneff palpably owed a duty under *Brady* to disclose Mrs. Bayan's statement to Roy Shirk.

Again, Mr. Kenneff was indifferent to the law, because it impeded his conviction of Lisa Lambert.

21. *Failure To Disclose That The Front Hallway Showed Signs Of An Obvious Struggle, Including Blood Stains And A Gouge In The Wall*

*See supra* Actual Innocence Item # 5.

22. *Failure To Disclose That Laura Thomas Had Committed the Crime of False Report*

*See supra* Actual Innocence Item # 4.

23. *Failure To Disclose The Video Of The Dive Showing Discovery Of Pink Bag*

*See supra* Prosecutorial Misconduct Items # 5 and 9.

24. *Failure to Disclose Yunkin's Admission that He Often Wore the Earring Found at the Crime Scene*

*See supra* Prosecutorial Misconduct Items # 8 and 12.

25. *Failure to Disclose That the Rope Found at the River Was Discovered Through a Bloodhound Following Buck's Scent* [40]

Allen L. Means, an expert on the handling of bloodhounds, testified on April 2, 1997 that he volunteered his services to law enforcement authorities to assist in the search for evidence along the banks of the Susquehanna River and Pequea Creek on December 23, 1991. N.T. at 609–622. His dog, Clementine, was at the site exposed to a "scent article", a white sweater Tabitha Buck wore. Clementine immediately picked up a scent from across the river and led Mr. Means and the officers to a "rope that was sticking out of the edge of ice" at the river's shore.

Mr. Means, with no other interest to serve in his testimony but the truth, reported that he was never debriefed or interviewed about

---

40. We have by no means exhausted the *Brady–Giglio* violations proved by clear and convincing evidence at the hearing. Because we have surely by now beaten the life out of that horse, we shall note the others we have found by title:

FAILURE TO DISCLOSE TO THE DEFENSE:
26. *Interview with Lena Fisher*
27. *The Ellis Brothers Did Not See Yunkin at McDonald's*
28. *Yunkin's Not Working on December 20 Because of Overtime Limit*
29. *Officer Fassnacht's Report Regarding Yunkin's Rape of Laurie Show*
30. *Finding of Yunkin's License Plate that Was on the Car the Morning of the Murder*
31. *Shawn Lapp Correspondence with Yunkin*
32. *That Kelly and David Glatfelter Repeatedly Visited Yunkin in Prison*
33. *High School Secretary Patricia Berry's Testimony About Hazel Show's Departure Time*
34. *Police Report Containing Evidence that Hazel Show Spoke to Her Daughter from School that Morning.*

Clementine's discovery. This debriefing failure was contrary to his experience in other cases, where it was done routinely. *See* N.T. at 616. The following paragraph will explain why.

Officer Reed, who participated in that December 23, 1991 river search, wrote in his report about it (P–295) that "the dog was unable to find any evidence." *Id.* at 3. To the contrary, he wrote—and testified before us on April 14—the rope was found by one John Forward (though Reed does record that "[a] white sweater worn by Tabitha Buck was brought to the scene."). Detective Barley testified to the same effect before us on April 7.[41]

Putting aside the legal consequences of Reed's and Barley's palpable untruths under oath, it is only necessary in this section to note that Clementine's discovery, and how she made it, was never disclosed to Roy Shirk. Since the evidence links Buck to the article of strangulation, it could not have been more material or favorable to the defense.

*Mr. Kenneff's Testimony Regarding These Brady–Giglio Violations*

In his testimony before us on April 15, First Assistant District Attorney Kenneff professed ignorance of many of the cited items that were withheld from Mr. Shirk. Putting aside the fact that members of his trial team, led by Detective Savage, all knew of this information, Mr. Kenneff's testimony on this point is unworthy of belief, for a number of reasons.

First, the record shows that Mr. Kenneff was intensely aware of his *Brady* duties. For example, on July 7, 1992, Mr. Kenneff wrote a cryptic letter to Mr. Shirk (P–764) seeking defense counsel's correction of the prosecutor's impression that the defense would contend that "shortly after 7:15 a.m., Yunkin picked up Lambert at the wooded area" that is approximately a quarter mile removed from the Show's condominium. When he heard nothing from Mr. Shirk to negate this understanding, Mr. Shirk testified that the disclosure of Kathleen Bayan's report would be inculpatory rather than exculpatory. In other words, his July 7, 1992 letter was a set-up of Mr. Shirk to relieve Mr. Kenneff of what he knew his *Brady* duty to be on this very important evidence.

But of course Mr. Kenneff's testimony that this evidence was "inculpatory" is a fantasy. Since Lisa Lambert never denied being in the car *and* at the condominium, placing her coming out of the Show condominium neighborhood, rather than at "the wooded area" would have been confirmatory of her testimony. Further, the fact that Mrs. Bayan saw a man fitting Yunkin's description, and driving Yunkin's car, placed Yunkin toward the Show condominium, consistent with Ms. Lambert's testimony. Mrs. Bayan's description of the man pushing down the heads of the man's passengers was also confirmatory of not only Lisa Lambert's testimony, but of Yunkin's leadership of the escape enterprise.

In sum, Mrs. Bayan's testimony was in no way inculpatory but was totally exculpatory, and Mr. Kenneff knew it.

Mr. Kenneff also testified that in anticipation of trial, he had before him *all* of the police reports. Detective Savage, the prosecuting officer in charge, confirmed that he put all documents of any possible relevance before the Commonwealth's attorney. Mr. Kenneff's memory of what he failed to see or do coincides with his *Brady–Giglio* vulnerability, and so we take him at his word that, as

---

41. In his testimony before us, Barley repeated the party line that the rope was found "under the ice" or "embedded in ice." N.T. at 971 (April 7, 1997).

By the time he wrote his "Initial Crime Report" (P–1), Savage decided to write that "The rope was found under ice." *Id.* at 25. This of course contradicts Mr. Means's testimony that "there was some rope that was sticking out of the edge of the ice." N.T. at 613 (April 2, 1997). *See also* N.T. at 621 ("There was some sticking up out of the water."). This discrepancy is, we believe, revealing of Savage's intent to be doubly sure that the rope not be associated with the bloodhound. We suspect he and Barley were of what we now know is the mistaken belief that a bloodhound could not smell anything "under" or "embedded in" ice. Mr. Means explained at N.T. 621–22 how Clementine could overcome even ice, testimony that concluded with the following colloquy with us:

Q. So, she can find things even under ice?
A. Correct.
N.T. at 622.

First Assistant District Attorney, he in fact diligently reviewed all the reports that were presented to him involving the highest-profile murder he ever prosecuted.

Finally, Mr. Kenneff's testimony collided with that of Detective Savage, who specifically recalled telling Mr. Kenneff about Mrs. Bayan, and that the reason not to call her was that she was emotionally unstable.

Indeed, Mr. Kenneff's testimony before us on these *Brady*-related issues confirms the suspicions asserted in Ms. Lambert's amended petition regarding the most sinister of conduct by the second ranking prosecutor of Lancaster County.

\* \* \* \*

To summarize, we quote the Supreme Court in *Schlup.* These new facts in the evidence before us have raised sufficient doubt about Ms. Lambert's guilt "to undermine confidence in the result of the trial", since it was, from start to finish, tainted by wholesale "constitutional error," *Schlup*, 513 U.S. at 318, 115 S.Ct. at 862.

*Remedy*

By now it is clear that this is an extraordinary case. Indeed, our research has failed to find any other reported case with so many instances of grave prosecutorial misconduct.[42]

Lisa Lambert has proved by clear and convincing evidence at least twenty-five separate instances of such misconduct. In our view, a District Justice of the Commonwealth of Pennsylvania, former Detective Savage, may have committed perjury before us and obstructed justice in 1992.[43] Other witnesses in the state capital murder trial, including Chief County Detective Solt, Detective Barley, Lieutenant Renee Schuler, and Officers Weaver, Reed and Bowman, fabricated and destroyed crucial evidence and likely perjured themselves in the state proceeding. At least six seemed to perjure themselves before us. Agents of the Commonwealth intimidated witnesses both in the capital murder trial as well as in this habeas corpus proceeding. The prosecutor who tried the *Lambert* case and sought Ms. Lambert's execution knowingly used perjured testimony and presided over dozens of *Brady–Giglio* violations, may have committed perjury, and unquestionably violated the Rules of Professional Conduct before our very eyes.

As noted earlier, we shall refer the matter of Assistant District Attorney Kenneff's blatantly unethical (and unconstitutional) actions to the Pennsylvania Disciplinary Board for further investigation. We shall also refer this matter to the United States Attorney for investigation of possible witness intimidation, apparent perjury by at least five witnesses in a federal proceeding, and possible violations of the federal criminal civil rights laws.

We have found that virtually all of the evidence which the Commonwealth used to convict Lisa Lambert of first degree murder was either perjured, altered, or fabricated. The Commonwealth has even attempted to perpetrate a fraud on this Court by destroying the men's extra-large black sweat pants it used to convict Lisa Lambert and substituting a much smaller pair in this proceeding, apparently in an attempt to undermine Ms. Lambert's contention that it was Yunkin who wore the black sweat pants. Such total contempt for due process of law demands serious sanctions.

■ By the time Hazel Show finished her dramatic disclosures the afternoon of April 16, the respondents' counsel stated, "yes, I agree relief is warranted." N.T. at 2703 (April 16, 1997). In view of this concession, it requires no further elaboration to hold that Lisa Lambert has earned not only her writ but her immediate release from any custody.[44]

---

42. After Hazel Show's testimony revealed Detective Savage's misconduct, we invited both sides to cite us to any case from any jurisdiction in the English-speaking world where there was more prosecutorial misconduct. N.T. at 2703 (April 16, 1997). Neither side has proffered any such citation.

43. Obviously, other tribunals will judge these issues.

44. It is important to note that we afforded respondents as much time as they needed to develop an evidentiary record regarding relief. *See* N.T. at 2703. It is fair to say that their response was abbreviated. *See* N.T. of April 18, 1997.

The question we must now answer is whether—having obtained a conviction for first degree murder through the use of perjured testimony, obstruction of justice, destruction and suppression of exculpatory evidence, fabrication and alteration of inculpatory evidence, and intimidation of witnesses—and having attempted to preserve that conviction before this Court through further apparent perjury, witness tampering and indubitable violations of Fed. R.Civ.P. 11 and of the Rules of Professional Conduct—the Commonwealth is nevertheless entitled to get another try at convicting Lisa Lambert and sending her to prison for the rest of her life with no possibility of parole. In short, the question is whether we may accept a promise from anyone on behalf of the Commonwealth that a trial will be fair "next time."

Writing for the Court almost half a century ago, Mr. Justice Frankfurter counseled that:

> Regard for the requirements of the Due Process Clause inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings (resulting in a conviction) in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even towards those charged with the most heinous offenses. These standards of justice are not authoritatively formulated anywhere as though they were specifics. Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are so rooted in the traditions and conscience of our people as to be ranked as fundamental, or are implicit in the concept of ordered liberty.

*Rochin v. California,* 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952)(internal quotations and citations omitted) (reversing state court conviction "obtained by methods that offend the Due Process Clause"). To apply Justice Frankfurter's now-famous *Rochin* locution, the Commonwealth's conduct in this matter shocks our conscience. *See id.* at 172, 72 S.Ct. at 209–10.

Then–Justice Rehnquist, writing for the Court twenty-one years later, predicted that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). If Lisa Lambert's is not the "situation" to which Chief Justice Rehnquist referred, then there is no prosecutorial malfeasance outrageous enough to bar a reprosecution.

The fact is the Commonwealth rigged the proceedings in the state trial to such an extent that it was a trial in name only. In addition, the police and prosecutorial misconduct was not only outrageous, but also led directly to the conviction of a woman we have found by clear and convincing evidence to have been actually innocent of first degree murder. *Cf. Bank of Nova Scotia v. United States,* 487 U.S. 250, 263, 108 S.Ct. 2369, 2378, 101 L.Ed.2d 228 (1988) (prosecutorial misconduct also requires finding of prejudice to the defendant); *United States v. Bagley,* 473 U.S. 667, 684, 105 S.Ct. 3375, 3384–85, 87 L.Ed.2d 481 (1985) (prosecutorial misconduct constitutes grounds for relief if the defendant shows that there was a reasonable probability that the misconduct affected the outcome of the trial).

We find that (1) the twenty-five constitutional violations which we have canvassed above, when coupled with (2) the misconduct we have witnessed in our own courtroom and (3) our finding that Lisa Lambert has met the "actual innocence" standard of *Schlup* and the AEDPA, in addition to (4) the corruption of the state trial from start to finish by police and prosecutorial misconduct, are together exactly the sort of outrageous violation of the norms of a civilized society to which Justice Frankfurter and Chief Justice Rehnquist referred. As a result, we hold that the Due Process Clause of the Fourteenth Amendment bars the Commonwealth from invoking judicial or

any other proceedings against Lisa Lambert for the murder of Laurie Show.[45]

We are fortified in this conclusion by the settled jurisprudence that we effectually sit as a court of equity. As the Supreme Court put it in *Schlup:*

> [T]he Court has adhered to the principle that habeas corpus is, at its core, an equitable remedy.

*Schlup,* 513 U.S. at 319, 115 S.Ct. at 863. In this case, these equitable considerations preclude our leaving the decision whether to retry Lisa Lambert in the hands of those who created this gross injustice. In view of the ancient maxim that "equity delights to do justice, and not by halves,"[46] to give Ms. Lambert full relief in these circumstances we can do nothing to benefit or empower those who so wronged her.

In sum, allowing the Commonwealth to proceed again against Lisa Lambert after what the Commonwealth has done to her to date would be, to borrow Justice O'Connor's locution from *Herrera,* a "constitutionally intolerable event."[47]

*Conclusion*

This is a case with no shortage of victims. First and foremost among the victims of what happened here is, of course, Lisa Lambert. For her, the long nightmare that began in her teens is ending. It will, however, take much more than the granting of her petition to heal the wounds and banish the demons that have for so long hurt and haunted her.

Another victim is Hazel Show and her family. As a result of this headlong caricature of a prosecution, this courageous and honest mother has been deprived of the finality and closure she so richly deserves after the murder of her only child. Had law enforcement officials merely followed the clear guidelines the Constitution provides, this matter would have ended almost five years ago, and the process of healing would have begun then. These law enforcement officials unquestionably have wounded Hazel Show and her family.

The people of Lancaster County are also victims at the hands of their own government. The community's proper and good feelings of compassion toward the Shows, and outrage at this horrible crime, were abused here. Just as the Shows have suffered from the lack of closure, so has the community at large.

But this same community has a powerful interest in the outcome we have reached here. This case shows how high a price the community pays when its government ignores the Constitution to get instant revenge. This case thus demonstrates the importance of preventing a recurrence of such a grotesque parody of due process.[48]

**45.** We are confident that our holding gives no offense to federal-state comity in view of the Supreme Court of Pennsylvania's decision in *Commonwealth v. Smith,* 532 Pa. 177, 615 A.2d 321 (1992). In *Smith,* the Court held that the Double Jeopardy Clause of the Pennsylvania Constitution barred the retrial of a defendant where there were three serious instances of prosecutorial misconduct. *Id.* While our decision is based upon the Fourteenth Amendment to the federal Constitution's Due Process Clause, we are confident that the Pennsylvania Supreme Court would also bar retrial in this case on Double Jeopardy grounds.

The parties have addressed the issue of whether the federal Double Jeopardy Clause would bar a retrial in this case, and Ms. Lambert has cited, *e.g., Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982) and *United States v. Wallach,* 979 F.2d 912, 915–16 (2d Cir.1992), *cert. denied* 508 U.S. 939, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993). We do not reach that issue because it seems to require us to determine the

*res judicata* effects of our own judgment, an impermissible enterprise. In this regard, it did not escape our attention that *Kennedy* and *Wallach* both involved retrials at which the defendant raised the Double Jeopardy question. In any event, for a more complete analysis of the Double Jeopardy implications of cases such as *Smith* and *Lambert, see* Anne Bowen Poulin, *The Limits of Double Jeopardy: A Course into the Dark?,* 39 Vill.L.Rev. 627 (1994).

**46.** 30A C.J.S. *Equity* § 119 (1992); *see also* 1 *Pomeroy's Equity Jurisprudence* § 181 (1941) (discussing history of, and rationale for, the maxim). This maxim is corollary of another, "when equity once acquires jurisdiction, it will retain it so as to afford complete relief." *Id.*

**47.** *Herrera v. Collins,* 506 U.S. 390, 418–20, 113 S.Ct. 853, 870, 122 L.Ed.2d 203 (1993) (O'Connor, J. concurring).

**48.** Because preventing a recurrence of this legal catastrophe is so important to that community

And as to District Justice Savage and First Assistant District Attorney Kenneff, Chief County Detective Solt, Detective Barley, Lieutenant Schuler and Officers Weaver, Reed and Bowman, as well as the others in active connivance with them, we can only say that they all should have known better than what they did—and tried to do—to Lisa Lambert.[49]

*Digression 1: Respondents' Extra–Schlup Arguments*

Respondents have consistently maintained that Ms. Lambert has failed to exhaust her remedies under the state Post–Conviction Relief Act ("P.C.R.A."), at least as to some of the issues which she raises in her federal petition. Although respondents' concession that relief is "warranted" after Hazel Show's April 16 disclosure moots this position, we will nevertheless address it.

 Our reading of the Post–Conviction Relief Act makes it clear that the Pennsylvania General Assembly amended the P.C.R.A. on November 17, 1995—about ten months after *Schlup,* decided on January 23, 1995— to preclude this sort of a petition.[50] The pre–1995 P.C.R.A. excused waiver of a claim if "the alleged error has resulted in the conviction or affirmance of a sentence of an innocent individual." 42 Pa. Con. Stat. § 9543(a)(3)(ii) (Historical and Statutory Notes). The current P.C.R.A. now is clear that a petitioner may not raise *any* issue which that petitioner has waived, with no exception for actual innocence or for procedural default which a federal court would excuse under the cause and prejudice standard. 42 Pa. Con. Stat. § 9543(a)(3).

It is true that the definition of "waiver" as failure to raise an issue which the "petitioner

could have raised," 42 Pa. Con. Stat. § 9544, might be read in a vacuum to incorporate the now-deleted concepts of cause and prejudice and actual innocence as excusing waiver. However, the pre–1995 P.C.R.A. definition of "waiver" also included the phrase "could have raised" in its definition of waiver, *see* 42 Pa. Con. Stat. § 9544 (Historical and Statutory Notes). As we explain above, that earlier iteration of the P.C.R.A. also contained provisions which excused waiver on the grounds of actual innocence and the federal standard of cause and prejudice. *See* 42 Pa. Con. Stat. § 9543, Historical and Statutory Notes (setting out former 42 Pa. Con. Stat. § 9543(a)(3)(ii)) ("If the allegation of error has been waived, [the petitioner must plead and prove by a preponderance of the evidence that] the alleged error has resulted in the conviction or affirmance of sentence of an innocent individual.") and § 9543(a)(3)(iii) ("If the allegation of error has been waived, [the petitioner must plead and prove by a preponderance of the evidence that] the waiver . . . does not constitute a State procedural default barring Federal habeas corpus relief.").

We do not read the Pennsylvania General Assembly's elimination of the actual innocence and cause and prejudice standards as mere housekeeping, but rather as an advertent decision after the Supreme Court's decision in *Schlup* to place those issues squarely into the federal forum. The Pennsylvania General Assembly having expressly created exceptions to waiver and then expressly having repealed those exceptions, we cannot place upon the words "could have raised" a reading that would restore the exception the legislature expressly repealed only two years

---

and others, and because it addresses a *leitmotif in the parties' evidence and argument,* we offer Digression 2 on why we believe this could have happened in Lancaster County.

**49.** By contrast, the firm of Schnader, Harrison, Segal & Lewis has distinguished itself by its work in this case. The firm devoted to this matter the resources one would expect in hostile tender offer litigation. Here, the Criminal Justice Act's limits assure that the firm's revenue on this matter will bear no resemblance to what it would receive in tender offer work. Notwithstanding this economic reality, Christina Rainville, Esq.

and Peter S. Greenberg, Esq. and their talented team have brought high intelligence and professional skill, as well as passion, to this just cause, and in so doing have brought credit to themselves, their firm, and the bar at large.

**50.** *See Peoples v. Fulcomer,* 882 F.2d 828, 831 (3d Cir.1989)("[I]f a fair reading of the state post-conviction relief statute indicates that a state court might well entertain . . . claims not raised in prior proceedings, and in the absence of a state court decision clearly foreclosing such a result, [petitioner] has not exhausted his state remedies")(internal quotations omitted).

ago absent a decision from the Pennsylvania Supreme Court to the contrary.

Respondents have pointed us to two DNA cases, *Commonwealth v. Reese*, 444 Pa.Super. 38, 663 A.2d 206 (1995), and *Commonwealth v. Tanner*, 410 Pa.Super. 398, 600 A.2d 201 (1991), which did not apply the new P.C.R.A. waiver provisions. We agree that under the old P.C.R.A. actual innocence standard, a Pennsylvania court might well have deemed Lambert's waiver excused by her claims of actual innocence; it is clear from the new P.C.R.A. statute that this would not be the case today.

We therefore find that Ms. Lambert has exhausted all of the claims which she raises in this proceeding, except as to after-discovered evidence that expands the degree of the violations brought to Judge Stengel's attention or confirm Ms. Lambert's contention that she is actually innocent, a claim the Pennsylvania General Assembly has taken away from her in state court.

 To the extent that there may be any claims which a Pennsylvania court might view as not having been waived, we find that the state proceedings that would follow if we dismissed this action are ineffective to protect the rights of Ms. Lambert. *See* 28 U.S.C. § 2254(b)(1)(B)(ii). Were we to dismiss this case as a mixed petition pursuant to *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), on the suspicion that *perhaps* our reading of the P.C.R.A. is wrong, petitioner would be deemed to have had her one bite at the federal apple as contemplated in the AEDPA. This would mean that for her to return to federal court, she would under this hypothesis need the approval of the Court of Appeals, and denial of her application is unreviewable by the Supreme Court. *See Felker v. Turpin*, — U.S. ——, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996). While this may be permissible in the ordinary habeas case, in this extraordinary— or perhaps even unique—case, as will be seen from the record, this is a constitutionally intolerable result which fails to protect Ms. Lambert's rights.

 Finally, even assuming that this is a mixed petition, we find that this is an extraordinary case in which the principles of comity that inform the requirement of exhaustion,[51] must give way to the imperative of correcting a fundamentally unjust incarceration. To explain why we are not requiring total exhaustion of these claims and why we may excuse any procedural default, it is helpful to explain the rationale for the two doctrines. In a word, the two doctrines rest on comity.

As respondents stated in their answer to the petition, "[t]he policy underlying the doctrine of exhaustion derives from the principle of comity in that the state court system should be given the first opportunity to decide upon a petitioner's allegations and address any alleged violations of a defendant's rights." Respondents' Answer at 13 (citing to *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971) and to *O'Halloran v. Ryan*, 835 F.2d 506, 509 (3d Cir.1987)).

 The AEDPA confirms that the exhaustion requirement is not jurisdictional. "Under 28 U.S.C. § 2254(B)(I,ii) [*sic* ] a district court will only deviate from the exhaustion requirement if 'there is an absence of available State corrective process or circumstances exist that render such process ineffective to protect the rights of the applicant.'" Respondents' Answer at 13.

Likewise, the doctrine of procedural default is founded upon the same concerns for comity. *See Murray v. Carrier*, 477 U.S. 478, 495–96, 106 S.Ct. 2639, 2649–50, 91 L.Ed.2d 397 (1986). The Supreme Court has counseled that:

In appropriate cases the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.' We remain confident that, for the most part, 'victims of a fundamental miscarriage of justice will meet the cause-and-prejudice standard.' But we do

---

**51.** *See Rose*, 455 U.S. at 522, 102 S.Ct. at 1205 ("a total exhaustion rule promotes comity and does not unreasonably impair the prisoner's right

to relief."); *see also Peoples*, 882 F.2d at 832 n. 2 (noting the federal-state comity interest that exhaustion serves).

not pretend that this will always be true. Accordingly, we think that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.

*Id.* (quoting *Engle v. Isaac,* 456 U.S. 107, 135, 102 S.Ct. 1558, 1576, 71 L.Ed.2d 783 (1982) (internal citations and quotations omitted)).

Just as the principles of comity that inform the doctrine of procedural default must give way when there is a manifestly unjust incarceration, so too must those principles that undergird the exhaustion requirement give way. As demonstrated at great length in the body of this Memorandum, Ms. Lambert has proved beyond any doubt precisely such a case.

*Digression 2: Why Did This Happen?*

Those who have read this sad history may well ask themselves, how could a place idealized in Peter Weir's *Witness* become like the world in David Lynch's *Blue Velvet?* Because it is so important to that community— and indeed to many others—to prevent a recurrence of this nightmare, we offer a few reflections on the record.

Laurie Show's grandfather, Dr. Whitlow Show, was in the 1980s Coroner of Lancaster County. Her mother, Hazel, is, as we saw on April 16, a paragon of morality, and kept and, we are sure, keeps what we saw in the video of her condominium as a picture-perfect home. Regrettably, Laurie Show had enough contact with the Lancaster County *demi-monde* to meet the very symbol of that dark world, Lawrence Yunkin. He raped Ms. Show on an early date, as he did to Lisa Lambert on their fourth. Unlike Lisa Lambert, however, Laurie Show eventually complained to her mother about it, who lodged a complaint with the East Lampeter Police Department. Reports of this complaint motivated Yunkin to concoct his plan to intimidate Laurie Show into silence, an idea that ended in her brutal murder at his and Buck's hands.

The record is clear that East Lampeter Township Police Chief Glick and his colleagues never considered any other suspects than the now-familiar three. And of this trio, Lisa Lambert was as though delivered from Central Casting for the part of villainess. By the testimony of those who loved her, Aimee Shearer Bernstein and Michael Pawlikowski, she was at the time literally "trailer trash."

The community thus closed ranks behind the good family Show and exacted instant revenge against this supposed villainess. It is important to stress that this solidarity and compassion for the Shows defines our outsiders' idealization of this community. But then what was and is a social strength was turned inside out into corruption.

Almost immediately after the snap judgment was made, law enforcement officials uncovered inconvenient facts such as the absence of cuts and bruises on Ms. Lambert— answer, no photographs of her—and many on Tabitha Buck and some on Yunkin—answer, conceal or destroy the mug shots. And as these untidy facts accumulated, Kenneff and Savage discovered a balm for these evidentiary bruises, Lawrence Yunkin. Yunkin would say and do anything to obtain what his lawyer rightly described as "the deal of the century" in the February 7, 1992 plea agreement for "hindering apprehension", which would carry a state sentencing guidelines range of 0–12 *months.* Thus Lancaster's best made a pact with Lancaster's worst to convict the "trailer trash" of first degree murder.

In making a pact with this devil, Lancaster County made a Faustian Bargain. It lost its soul and it almost executed an innocent, abused woman. Its legal edifice now in ashes, we can only hope for a *Witness*-like barn-raising of the temple of justice.